# NATIONAL LABOR RELATIONS BOARD v. STEINBERG et al.

No. 12814.

United States Court of Appeals
Fifth Circuit.

June 7, 1950.

Rehearing Denied July 17, 1950.

C. Paul Barker, Special Counsel, National Labor Relations Bd., New Orleans, La., David P. Findling, Associate Gen. Counsel, A. Norman Somers, Assistant Gen. Counsel, National Labor Relations Board, Washington, D. C., for petitioner.

Haywood H. Hillyer, Jr., New Orleans, La., for respondent.

Before HOLMES, McCORD and BORAH, Circuit Judges.

BORAH, Circuit Judge.

The question here is whether certain named fur trappers are employees of respondents within the meaning of the National Labor Relations Act. This question arises upon a petition of the Labor Board[1] for enforcement of its order issued against respondents on July 14, 1948, following the usual proceedings in accordance with Section 10 of the Act. The Board, one member dissenting, found the trappers to be employees and further found that the employer interfered with, restrained, and coerced "its employees in violation of Section 8(a) (1) of the Act and discharged and refused to hire employees because of their union membership in violation of Section 8(a) (3) of the Act. Accordingly, the Board ordered respondents to cease and desist not only from the unfair labor practices found but also from in any manner interfering with, restraining, or coercing their employees in the exercise of the rights guaranteed in Section 7 of the amended Act. In addition, the Board ordered the employer (1) to offer employment and reinstatement to those ten named trappers unlawfully discriminated against; (2) to make the trappers whole; and (3) to post the usual appropriate notices. Denying the commission of the charged unfair labor practices and reurging their motion to dismiss the charges for lack of jurisdiction, respondents insist that the trappers herein involved are not employees within the meaning of the Act but are independent contractors and sublessees to whom the coverage of the Act does not extend.

The substance of the evidence was as follows: The low swamp and marsh lands of Southwestern Louisiana stretching from the delta lands of the Mississippi river westward along the Gulf of Mexico to the State of Texas is a natural habitat for the muskrat and other fur-bearing animals. Prior to World War I a system of "free-trapping" prevailed in this area, and under this system the trappers went upon the land and staked out desirable trapping lands for the season, and held it by force, if they were able, against the claims of others. This system continued until around 1918 or 1919, when the demand for muskrat pelts and the corresponding increase in their value prompted landowners to take advantage of this source of revenue by leasing their lands for trapping purposes. This leasing system prevails to the present day and one such lessee is Steinberg and Company.

The respondents, Morris Steinberg and Julian Leslie Steinberg, a Louisiana partnership doing business as Steinberg and Company, are engaged in the business of buying and selling raw furs[2] and in leasing and subleasing of lands for trapping purposes. At the time of the hearing in this case, respondents had approximately one million acres of trapping lands under lease from large landowners. The leases held by respondents gave them only the right to take from the lands the fur-bearing animals ensnared thereon and the consideration therefor was either a cash rental, or a rental based upon a percentage of the proceeds of the sale of the pelts taken from the lands, subject to a guaranty of a minimum amount. Several of the leases require that the lands be sublet to trappers in such manner as to enable respondents to secure the possession for sale of the furs captured, unless, with the lessor's consent, a different arrangement is necessitated by physical location of any of said lands, or for other reasons.

The respondents enter into agreements with parties called agents, or fur-buyers, under the terms of which these agents, in the area to which they are assigned in the field, are given the authority to sublease these lands to trappers. In addition, the agents, who are licensed fur-buyers under State law, patrol the lands to prevent trespass and perform such other duties as

1. The petition for enforcement is made pursuant to Section 10(e), National Labor Relations Act, 49 Stat. 449, 29 U.S. C.A. § 151 et seq., as amended by the Labor Management Relations Act 1947, 61 Stat. 136, 29 U.S.C.A. § 141 et seq.

2. During the period 1936–1943, respondents purchased pelts from independent fur buyers and trappers (that is, other than those to whom they had leased land) in the total amount of 49.2% in dollar value and 42.1% of all pelts handled by respondents.

are hereinafter stated. The subleases which the agents negotiate with the trappers are in writing and are limited to one trapping season which is normally of seventy-five days duration, and this form of agreement has been used generally by respondents since 1933. Prior to that time contracts containing language of employment were used, and the Board found that the change in the form of the instruments to lease agreements was not occasioned by any improper motive. This conclusion was fully warranted because all private landowners and school boards were at that time customarily using the lease form of agreement in Louisiana. The record also shows that there was no fixed manner or method of issuing the written subleases to the trappers; some were issued before the trapper went on the land, other agreements were received by the trapper in the marsh, and some were even issued after the trapping season had begun.

A few weeks before the trapping season opens, the trapper commences to gather his equipment together. He cleans up his camp boat and such floating equipment as he possesses, lays in a supply of food, fuel, traps, and other necessities, and then, accompanied by his family, he starts out for the marsh lands. Much of the trapping land is many miles from any highway or road and the sole means of communication is by boat. Upon arrival at his trapping grounds and after setting up his camp, the trapper burns off the dead marsh grass, primarily so that he can get around over the land and run his trap lines. The burning also facilitates the growth of the young three-cornered grass, the roots of which are the principal food of the muskrat. The trapper also cleans out ditches and drains to enable him to travel in his pirogue without hindrance. Having in the exercise of his own judgment and without compensation completed such preliminary preparations as he deems necessary, the trapper is now ready to go to work. At the opening of

the season he set his traps along the "rat runs" and at other places where his experience has taught him that the muskrats are likely to be. Each morning he is up at dawn, removing the trapped muskrats and resetting the traps. Insofar as the actual trapping operation is concerned the trapper is left entirely to his own devices. The trapper is assisted in his work by his family, with his wife and children taking an active part in running the traps, skinning the muskrats and in caring for the pelts.

Respondents' agents visit the camps periodically [3] to grade, pay for, and pick up the furs that have been prepared for market. When the agent calls at the camp, either the trapper or his wife or some relative is generally present to deliver the furs to the agent. The agent then examines the furs and separates them into various piles according to their grade. Having determined the number of pelts in each grade, he then calculates their total value according to a price list furnished him each week by respondents.[4] From the total value, the agent subtracts the thirty-five percent rental due respondents and issues to the trapper a draft on Steinberg and Company for the sixty-five percent balance, which represents the trapper's gross profits for the period.

As previously stated, the trapper furnishes all of his own equipment and supplies, and such investment, exclusive of the value of his camping quarters and boats, may amount to as much as three hundred dollars for the seventy-five day season.[5] Some of the trappers make but little profit, some lose money, and some make in excess of four thousand dollars during the short seventy-five day season. The amount of profit, of course, is directly related to the productivity of the land, the industry, skill and ingenuity of the trapper and the amount of assistance he obtains from his family and others during the season. After the trapping season is over, the trappers

3. The frequency of visits varies from a week to two weeks or more.

4. There is no testimony that Steinberg has ever paid less than the selling price prevailing in the field, required by the

terms of the agreement and by Louisiana Act No. 193 of 1940.

5. Avery Burke, a Board witness, itemized purchases of equipment and supplies for one season totaling over $550.00.

pursue other occupations, such as fishing, boat rental, painting, carpentry, and the like. It also appears from the evidence before the Board that respondents were advised by the proper authorities that they were not obligated to pay, and in consequence they do not pay Social Security or Unemployment Insurance taxes nor deduct withholding taxes.

Respondents contend that the trappers in the present case are sublessees under Louisiana law. The Board, however, is unwilling to concede the existence of this relationship and seemingly attaches considerable importance to the fact that the lands, the boundaries of which are well known to the parties, are not always accurately described in the contracts,[6] and they point out that some of the leases were not properly signed and authenticated by the lessee. We think that these irregularities are of no great importance because under local law such leases may be oral.[7] Article 2670 of the Civil Code of Louisiana provides that in the contract of lease three things are necessary: the thing, the price and the consent; and Article 2671 provides that the price may consist of a portion of the fruits yielded by the thing leased. It is also the law of Louisiana that trapping privileges may be the subject of a valid lease.[8] The contention that there is no fixed price or rental stipulated in the present lease is without merit. The price is specified in the agreements and is in strict accordance with the requirements of Louisiana Act No. 193 of 1940.[9] The contracts here purport to be subleases and the agreements being susceptible of that construction, the court should be slow to assign any other term to the relationship resulting from the contracts, unless it clearly appears that this relationship must be rejected in favor of definitions and concepts expressed or implied in the Federal Statute itself. While we believe these are valid subleases under Louisiana law, we are mindful of the fact that this holding is not determinative of the issue here but is only one factor which must be considered in determining the true relationship existing between the parties.

As in the Social Security Act, 42 U.S.C.A. § 301 et seq., and the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. the term "employee" is not defined in the National Labor Relations Act and the authorities have been at variance in the past as to the "test" to be applied in determining whether or not an employment relationship exists under this and similar remedial legislative acts.[10] However the legislative history of the Taft-Hartley Law, which was adopted in 1947 as an amendment to the National Labor Relations Act, shows quite clearly that when Congress passed the Labor Act it intended the word "employee" to mean someone who works for another for hire [11] and this clear expression

---

6. A precise description of the lands would be impracticable because conditions are constantly changing.

7. Article 2683 of the Civil Code of Louisiana.

8. Gordy v. Maestri, 170 La. 281, 127 So. 628.

9. The Act requires that contracts of lease or sublease of trapping lands must contain a provision "that the trapper shall receive not less than sixty (60%) percent of the gross value of the furs (captured and delivered in accordance with said contract) based on the selling price of such furs prevailing in the field on the day when and at the place where such furs or pelts are delivered by the trapper to the landowner, lessee or sublessee." The contracts involved herein specify that the trappers shall receive sixty-five percent of the gross value.

10. N. L. R. B. v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170; Hearst Publications v. N. L. R. B., 9 Cir., 136 F.2d 608; N. L. R. B. v. Phoenix Mutual Life Ins. Co., 7 Cir., 167 F.2d 983, 6 A.L.R.2d 408, certiorari denied 335 U.S. 845, 69 S.Ct. 68, 93 L.Ed. 395; U. S. v. Silk, 331 U.S. 704, 67 S. Ct. 1463, 91 L.Ed. 1757; Benson v. Social Security Board, 10 Cir., 172 F.2d 682.

11. The House Committee Report reads in part as follows:
"An 'employee', according to all standard dictionaries, according to the law as the courts have stated it, and according to the understanding of almost

of Congressional intent we are obligated to follow.[12]

■ It is generally stated in the authorities that the distinction between an independent contractor and an employee is found in the nature and the amount of control reserved by the person for whom the work is done. And that an employment relationship exists "whenever the employer retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished, or, in other words, 'not only what shall be done, but how it shall be done'." [13]

■ In determining that the trappers involved herein were employees within the meaning of the Act, the Board relied upon the hereinafter considered factors as evidencing an employment relationship. The Board found that the activities of the trappers constituted an "integral part" of the respondents' business. We agree that the subleasing of land to trappers and the receipt of the fur crop therefrom is a constituent or component part of respondents' business. By the same token it may be said that the leasing of rental properties to tenants is an integral part of the business of a realtor handling rental properties yet no one would be so bold as to claim that the tenants are his servants. Undoubtedly this factor should be considered, but it is by no means controlling.

The second factor relied upon by the Board involves the permanency of the relationship existing between the respondents and the trappers. The Board stated that, "their relationship with the respondents is virtually permanent" and pointed out that, "it is undisputed that many trappers have

everyone, with the exception of members of the National Labor Relations Board, means someone who works for another for hire. But in the case of National Labor Relations Board v. Hearst Publications, Inc., 1944, 322 U.S. 111 [64 S.Ct. 851, 88 L.Ed. 1170], the Board expanded the definition of the term 'employee' beyond anything that it ever had included before, and the Supreme Court, relying upon the theoretic 'expertness' of the Board, upheld the Board. * * * It must be presumed that when Congress passed the Labor Act, it intended words it used to have the meanings that they had when Congress passed the act, not new meanings that, 9 years later, the Labor Board might think up. In the law, there always has been a difference, and a big difference, between 'employees' and 'independent contractors'. 'Employees' work for wages or salaries under direct supervision. 'Independent contractors' undertake to do a job for a price, decide how the work will be done, usually hire others to do the work, and depend for their income not upon wages, but upon the difference between what they pay for goods, materials, and labor and what they receive for the end result. That is, upon profits. It is inconceivable that Congress, when it passed the act, authorized the Board to give to every word in the act whatever meaning it wished. On the contrary, Congress intended then, and it intends now, that the Board give to words not far-fetched meanings but ordinary meanings." H. Rep. 245, 80th Cong., 1st Sess., p. 18.

Vol. 1, Legislative History of the Labor Management Relations Act, 1947, page 309.

The Conference Report reads in part as follows:

"The House bill excluded from the definition of 'employee' individuals having the status of independent contractors. Although independent contractors can in no sense be considered to be employees the Supreme Court in N. L. R. B. v. Hearst Publications, Inc., 1944, 322 U. S. 111, 64 S.Ct. 851, 88 L.Ed. 1170, held that the ordinary tests of the law of agency could be ignored by the Board in determining whether or not particular occupational groups were 'employees' within the meaning of the Labor Act. Consequently it refused to consider the question of whether certain categories of persons whom the Board had deemed to be 'employees' were not in fact and in law really independent contractors." " * * * The conference agreement follows the House bill in the matter of persons having the status of independent contractors." H.Rep. 510, 80th Cong., 1st Sess.; U.S.C.Cong.Serv., 80th Cong., 1st Sess., p. 1138.

12. N. L. R. B. v. Phoenix Mutual Life Ins. Co., 7 Cir., 167 F.2d 983, certiorari denied 335 U.S. 845, 69 S.Ct. 68, 93 L. Ed. 395.

13. Singer Manufacturing Co. v. Rahn, 132 U.S. 518, 10 S.Ct. 175, 176, 33 L.Ed. 440; American Oil Co. v. Fly, 5 Cir., 135 F.2d 491, 147 A.L.R. 824.

been trapping for respondents for a long time and that the trappers have a reasonable expectation of employment year after year." This finding is made despite the fact that the trapping season normally extends over a period of only 75 days, and that the leases are specifically limited to only one trapping season. It is undoubtedly true that respondents do lease the same land to the same trappers season after season, but the fact remain that there is no obligation on the part of respondents to do so and there is no evidence in this record to show that the trappers' expectation rises above that of any independent contractor whose work performance is satisfactory. In short, this aspect of the relationship favors the view that the trappers are independent contractors.

■ Another factor relied upon by the Board to evidence an employment relationship is found in the statement that "the respondents themselves recognized the employce status of the trappers until 1934, when they discontinued the use of employment contracts and adopted the lease or sublease form in use today [14] which, except for minor terminology, are (sic) substantially similar to the employment contracts." The Board's statement that the relationship was not altered by the changeover in form of agreement is bottomed on the fact that the trappers trapped the same way under both types of contract. A comparison of these contracts reveals substantial differences in content as well as terminology and the circumstance that the trappers were subject to no more control and supervision under the earlier agreements than they are today does not establish the fact that the earlier agreements created an employment relationship [15] nor militate against respondents' claim that the present sublease contracts express a true independent contractor relationship.

■■ Turning now to the specific provisions of the agreement upon which the Board relies to evidence an employment relationship, the Board found that respondents enjoy "absolute and exclusive control over the trappers' time during the season." This finding is based on an interpretation of certain provisions in the subleases under the terms of which the lessee "agrees to trap" the premises, to devote "his best efforts and skill" to this pursuit, to "not leave the leased premises * * without the consent of the lessor", and to "devote his entire time to said purpose." Of course it is necessary, not only as a practical matter but also as a matter of law, to impose upon the trapper an obligation to trap the lands. Furthermore, a requirement that a party to a bargain devote his entire time to the doing of a specific job, for a limited period of time, without retention or exercise of the right to say how the job shall be done, is entirely consistent with an independent contractor relationship and has no tendency to indicate an employment relationship. As for the requirement that the trapper will not leave the premises, this provision is to be expected, because of the circumstances peculiar to this industry. The remoteness of the trapping areas, the likelihood of selling furs to others without payment of rental thereon, the regulations of the Louisiana Conservation Department which require the traps to be run daily, and the resulting damage to furs that are not timely removed from the traps are some of the facts which show the necessity for this requirement, which goes to insuring that the trapper will perform the job to be done in the most effective manner possible. We find nothing determinative in these provisions of the agreement and the courts have repeatedly held that an employer has a right to exercise such control over an independent contractor as is necessary to secure the performance of the contract according to its terms, in order to accomplish the results contemplated by the parties in

14. The Board found that the change in the form of agreement was not improperly motivated but was prompted by a desire to conform to some of the master leases under which respondents held the trapping privilege.

15. Cf. Gordy v. Maestri, 170 La. 281, 127 So. 628.

making the contract, without thereby creating such contractor an employee.[16]

The Board found that "respondents also retain title to all muskrats caught by the trappers, subject to the payment of a percentage of the value thereof as determined by the respondents." The contract says nothing about "retaining title", it says that the "lessee admits that all furs captured * * * *shall* belong to * * * the lessor, and deliver same over to the lessor, * * * *upon* payment by the lessor to the lessee of the amount" therein set forth. (Emphasis supplied.) We find nothing in this provision that is inconsistent with an independent contractor relationship.

The Board further found that, "by virtue of their power to grade the furs the respondents control the amount of the trappers' earnings." We think otherwise. The contract obligates the lessor to pay for said furs the selling price prevailing in the field, and since all furs do not sell for the same price, it is necessary that they be graded to determine their value. There is no substantial evidence in this record to show that respondents in any instance paid less for a single fur than the selling price prevailing in the field. Furthermore, the contract does not provide that the trapper is bound to accept arbitrary grading by respondents' agent and it is reasonable to infer that the parties intended this function would be performed in good faith. In this connection, it is significant to note that respondents' agents are paid on the basis of seven percent of the total value they pay to the trappers for furs, which is, of course, an incentive for the agents to resolve in favor of the trapper all doubts in respect to the grading of furs.

As supportive of their findings, the Board also relied on those provisions of the contract giving respondents the right to check the trappers' daily catch and to inspect their premises, camps, boats, and paraphernalia. These provisions should be interpreted in the light of all the circumstances pertaining to this industry. Since respondents do not furnish any of the equipment, their only interest in reserving the right of inspection was to give them the means of ascertaining if furs caught on the leased premises were being "bootlegged" or sold to others, without payment of rental. This right of inspection does not show that respondents are interested in anything other than the results of the work performed.

The final provision of the agreement upon which the Board relied, as affecting the trappers' employee status and as a limitation on their personal freedom, involves the right of the respondents "to terminate the relationship by virtue of their option * * * or by refusing to renew the subleases the following year." An examination of the contract reveals that the option to terminate the contract is specifically limited to instances of breach of the terms of the agreement, or violations of law. It is sufficient to say that similar provisions are of common occurrence in leases and that their presence here does not suggest an employment relationship.

 This brings us to a consideration of the law applicable to the facts as related. The term "employee" under the Act, and as amended by the Taft-Hartley Law, does not include any individual that has the status of an independent contractor. The critical question therefore, is: Were the trappers independent contractors, or employees of respondents? And its solution here, as in each case, must depend largely upon its own peculiar facts. The usual test employed for determining the distinction between an independent contractor and an employee is found in the nature and the amount of control reserved by the person for whom the work is done, and the employer-employee relationship exists only where the employer has the right to control and direct the work, not only as to the result to be accomplished by the work, but also as to the manner and means by which that result is accomplished. It is the right and not the exercise of control which is the determining element.

 The trappers here follow their pursuit without any direction or control

---

16. Casement v. Brown, 148 U.S. 615, 622, 13 S.Ct. 672, 37 L.Ed. 582.

858

by the respondents. As a matter of fact, they do not even see respondent's agents oftener than once a week or once every two weeks. Admittedly unsupervised, the trappers determine their own working hours and the manner and means of performing their daily tasks. They furnish their own boats, traps and other equipment and pay for their trapping licenses. In their trapping activities they are assisted by their wives and children and sometimes others, none of whom, other than the trappers, are claimed to be employees of respondents. The trappers are paid solely on the basis of the number and quality of furs caught, and their earnings depend upon their own industry, ingenuity, and skill, aided by such assistance as they receive from their families and others. They follow their trapping pursuit only seventy-five days a year and the remainder of the year they are gainfully engaged in various other occupations, such as fishing, carpentry, and the like. The trappers are not carried on respondents' payroll as employees; moreover, Social Security and Unemployment Insurance taxes are not paid in their behalf, and no deductions for withholding taxes are made from their earnings. Furthermore, the parties themselves have since the year 1933 recognized their lessor-lessee relationship under valid subleases, which do not evince any right of effective control by respondents. In the light of these facts, we are of the opinion that any control exercised by respondents falls far short of that necessary to constitute them employers of the trappers. Even though full credit be given to the findings of the Board in regard to the control exercised, we do not, on the basis of the undisputed facts, believe it is sufficient, by whatever standards the trappers may be judged.

We hold that the trappers are independent contractors and sublessees to whom the coverage of the Act does not extend and consequently there is no need to consider the other questions which this record presents. It follows that the Boards' order should be set aside and its petition dismissed.