**NATIONAL VAN LINES, INC.,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD,** Respondent.

No. 12657.

United States Court of Appeals
Seventh Circuit.

Jan. 5, 1960.

Walter P. Loomis, Jr., Henry E. Seyfarth, Owen Fairweather, Chicago, Ill. (Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., of counsel), for petitioner.

Thomas J. McDermott, Assoc. Gen. Counsel, Marion L. Griffin, Stuart Rothman, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Frederick U. Reel, Washington, D. C., for National Labor Relations Board.

Before HASTINGS, Chief Judge, DUFFY, Circuit Judge, and GRUBB, District Judge.

HASTINGS, Chief Judge.

This is a petition by National Van Lines, Inc. (National) to review and set aside an order issued by the National Labor Relations Board (Labor Board) under Section 10(f) of the Labor Management Relations Act, 1947, as amended, 61 Stat. 136, 29 U.S.C.A. § 141 et seq. (the Act). The Labor Board filed a cross-petition requesting enforcement of such order.

On May 16, 1956, Van & Storage Drivers Local Union No. 389, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Union) filed a petition with the Labor Board seeking certification as collective bargaining agent for National's "lease and owner-operators" (contract-drivers). After a hearing, the Labor Board issued its Decision and Direction of Election on April 16, 1957, finding, *inter alia*, that the contract-drivers in question were employees of National within the meaning of Section 2(3) of the Act, 29 U.S.C.A. § 152(3), and that they were not independent contractors. It directed an election among such persons. Following denial of a motion for reconsideration of this decision, the Union won the mail ballot election conducted in May, June and July, 1957 by a vote of 26 to 25. Six ballots were challenged by the Labor Board agent in charge of the election because they were not received by the time specified in the notice of election, although they were received prior to the time established by the notice of election for opening and counting the ballots. Subsequently, the challenges were sustained by the Labor Board; on June 6, 1958 it issued its final order of certification favorable to the Union. (Report-

ed at 117 NLRB 1213 (1957) and 120 NLRB 1343 (1958) )

Based on a charge of refusal to bargain filed by the Union on November 19, 1958, the Labor Board issued its Decision and Order on May 25, 1959, finding that National violated Section 8(a) (5) and (1) of the Act by its admitted refusal to bargain with the certified representative of its contract-drivers. It directed National to cease and desist from (1) refusing to bargain with the Union and (2) interfering with, restraining or coercing its employees in the exercise of rights guaranteed by the Act. It further ordered National to take certain affirmative action which the Labor Board found would effectuate the Act. (Reported at 123 NLRB No. 157 (1959) )

Errors relied upon by National arise out of the determination that the contract-drivers were employees under Section 2(3) of the Act, not independent contractors; the refusal to count the six challenged ballots which could have affected the outcome of the election; and the making of certain findings of fact by the Labor Board which have no legal support in the record.

National is a corporation with its principal office in Illinois, near Chicago, and regional offices in New York City, Washington, D. C., Atlanta, Georgia, Dallas, Texas, Los Angeles and San Francisco, California, and Seattle, Washington. It is a common carrier by motor vehicle engaged in local and long distance transportation of household goods and similar commodities throughout the United States. All its operations are under the authority of a certificate of convenience and necessity issued by the Interstate Commerce Commission.

The critical question before us is whether, under the facts of this case, the contract-drivers were employees or independent contractors. The Labor Board and the Company are in full accord that this question of status is to be determined by common law tests.

■ Section 2(3) of the Act, *as amended in 1947*, provides in relevant

part that "[t]he term 'employee' shall include any employee, * * * but shall not include * * * any individual having the status of an independent contractor * * *." Prior to the 1947 amendments, this definition did not expressly exclude independent contractors. See 49 Stat. 450. The Act does not define the term "employee." "However the legislative history of the Taft-Hartley Law, which was adopted in 1947 as an amendment to the National Labor Relations Act, shows quite clearly that when Congress passed the Labor Act it intended the word 'employee' to mean someone who works for another for hire and this clear expression of Congressional intent we are obligated to follow." National Labor Relations Board v. Steinberg, 5 Cir., 1950, 182 F.2d 850, at pages 854–855.[1]

Prior to the 1947 amendments, the Supreme Court, in United States v. Silk, 1947, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757,[2] affirmed this court's holding in Greyvan Lines v. Harrison, 7 Cir., 1946, 156 F.2d 412, that the contract-drivers in that case were independent contractors and not employees. The case involved a suit to recover employment taxes collected from an employer under the Social Security Act, 42 U.S.C.A. § 401, et seq. There the Supreme Court said:

"* * * [W]here the arrangements leave the driver-owners so much responsibility for investment and management as here, they must be held to be independent contractors. These driver-owners are small businessmen. They own their own trucks. They hire their own helpers. In one instance they haul for a sin-

gle business, in the other for any customer. The distinction, though important, is not controlling. *It is the total situation, including the risk undertaken, the control exercised, the opportunity for profit from sound management, that marks these driver-owners as independent contractors.*" (Emphasis added.) 331 U.S. at page 719, 67 S.Ct. at page 1471, 91 L.Ed. 1757.

In the instant case, both parties cite our holding in National Labor Relations Board v. Phoenix Mut. L. Ins. Co., 7 Cir., 1948, 167 F.2d 983, 986, 6 A.L.R.2d 408, as authority for the proposition that we must follow the Congressional mandate in the 1947 amendments of the Act. Since both parties rely upon the rule and tests outlined by Judge Duffy in that opinion as being applicable standards in determining the status of an individual under the Act, we set them out at some length:

"A similar question was considered by this court in Williams v. United States, 7 Cir., 126 F.2d 129, 132, certiorari denied, 317 U.S. 655, 63 S.Ct. 52, 87 L.Ed. 527, where the rule was stated that each case must depend upon its own facts, and that the test most *usually* employed for determining the distinction between an independent contractor and an employee is found in the nature and the amount of control reserved by the person for whom the work is done. This court there pointed out that the employer-employee relationship exists when the person for whom the work is done has the right to control and direct the work, not

1. See footnote 11, pages 854–855, of 182 F.2d for excerpts from the House Committee Report and the Conference Report and the references therein to National Labor Relations Board v. Hearst Publications, Inc., 1944, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170.

2. While the opinion in United States v. Silk was handed down on June 16, 1947, prior to the 1947 amendments of the Act, it should be pointed out that the Taft-Hartley Bill had already been passed by

Congress and was at that time pending before the President for his consideration. A Presidential veto was finally overridden on June 23, 1947. There is no indication in the debate that Congress took cognizance of the Silk decision. However, it is noteworthy that from the time of the 1947 amendments through the recent major changes in the Act, Congress has not seen fit to redefine the character of those employees covered by the Act.

only as to the result accomplished by the work, but also as to the details and means by which that result is accomplished, and that it is the right and not the exercise of control which is the determining element. A number of tests were pointed out, such as the right to hire and discharge persons doing the work, the method and determination of the amount of the payment to the workmen, whether the person doing the work is engaged in an independent business or enterprise, whether he stands to make a profit on the work of those working under him, the question of which party furnishes the tools or materials with which the work is done, and who has control of the premises where the work is done. In addition to the tests there mentioned, consideration must be given to other factors, such as whether the relationship is of a permanent character, the skill required in the particular occupation, and who designates the place where the work is to be performed." Id. 167 F.2d at page 986.

See also, National Labor Relations Board v. Steinberg, supra, and National Labor Relations Board v. Nu-Car Carriers, 3 Cir., 1951, 189 F.2d 756. Cf. United States v. Mutual Trucking Co., 6 Cir., 1944, 141 F.2d 655.

In its operations National utilizes three classifications of drivers: employee-drivers, agents' drivers and contract-drivers. In this appeal we are concerned solely with contract-drivers. However, in order to have a picture of the "total situation," we shall briefly describe the other two categories.

Employee-drivers are either local or long distance drivers. National employs from 20 to 25 local drivers at its regional offices to make local pickups and deliveries, to transport household goods to warehouses for storage prior to long distance movement, and to perform some local moving jobs. Three long distance drivers operate company-owned equipment to transport household goods throughout the United States, as directed by National. These employee-drivers are paid wages and receive the same fringe benefits as other employees, including paid vacations, unemployment compensation, paid holidays and sick leave, and group insurance. National also makes social security contributions for them and withholds federal income tax deductions from their wages. These drivers wear the company uniform while working. The three long distance drivers at times are used to transport non-profitable shipments rejected by contract-drivers. It is undisputed that these drivers have the status of employees.

In another part of its operations, National uses agents who solicit business on a commission basis and also haul interstate for a percentage of the tariff revenue derived by National for such transportation. These agents are located in cities throughout the country and own and operate their independent businesses, use their own equipment and employ their own drivers. There were about 250 drivers for these agents, and clearly they do not have the status of employees of National.

The third classification of drivers used by National are the contract-drivers. There were about 123 in this group, exclusive of persons employed by them. They reside in 33 different states and operate throughout the United States. This arrangement has been used in some form since 1931. It has been governed by various written agreements for many years. The contract before us in this case was executed June 24, 1957, and is in evidence as Respondent's Exhibit No. 1. This agreement is one of the major factors to be considered in determining the relationship between National and the contract-drivers (referred to therein as "Contractors"), and we may look to this instrument and make our own evaluation of its contents.

Under the written contract, a Contractor agrees in substance as follows: to furnish for use in National's business a motor-powered tractor owned by him, together with a van-type semi-

trailer of his own or one made available to him, and all accessorial equipment required by National, as are acceptable to and approved by it in writing and in accordance with public authority; to drive his vehicles personally, except that he may employ additional, substitute or relief drivers as necessary, upon National's prior approval; to substitute only such equipment as may be approved by National; generally to comply with all requirements of public authority; to maintain his equipment at his own expense; to pay for all vehicle licenses and permits required of him by the state of his residence and by the State of Arizona (the others to be furnished by National); to pay all taxes incident to his ownership and operation of the vehicles and equipment furnished by him (National to pay all taxes imposed upon it by reason of the operation of such vehicles in its service as a motor carrier); to pay all operating cost of his vehicles, without limitation; to provide all labor required to perform his contract; to hire, direct, pay, control and discharge all of his own employees; to report and pay any taxes levied by reason of his employment of such employees, including federal income tax withholding, Social Security tax, Unemployment Compensation tax and similar charges; to provide and pay for required workmen's compensation and employer's liability insurance; to be responsible for all loss or damage to any semi-trailer or equipment furnished to him by National, except that National will bear the cost of physical maintenance of such property; to furnish National with indemnity covering collection of charges for transportation due National; and generally to perform the services incidental to the loading, hauling and delivery of the goods being transported for National, including necessary reports of his business activities and daily reports of his whereabouts, the contents of his vehicles, mileage and gas purchases and other pertinent data.

Pursuant to the agreement, a Contractor is compensated for his services by a specified percentage of the tariff revenue received by National for transportation services in varying percentage amounts set out in an agreed rate schedule. This is paid in a lump sum for each trip. The agreement is to continue on a year-to-year basis subject to termination by either party at any time upon written notice as provided therein.

Finally, the agreement expressly sets out that "it is the intent of the parties hereto that Contractor is an independent contractor only and neither Contractor nor his employees are employees of [National]. * * * [And National] has not the right to, and will not control * * * the manner, or prescribe the method, of doing that portion of the business * * * which is contracted for herein by Contractor." While we look to substance rather than form in construing a contract, this language is at least indicative to some degree of the intention of the parties.

The evidence shows that of approximately 123 contract-drivers under consideration here, all own their tractors and about 30 own the trailers used by them. Several of them own multiple-unit outfits. Trailers owned by National are furnished for the use of those who do not own them. All such persons have a substantial investment in their equipment. They did not "lease" their equipment to National.

The Labor Board urges that the agreement and the testimony in this case clearly demonstrate that National exercises such control over the "details and means" by which the contract-drivers perform their work to establish the existence of the employment relation. In support of this contention it points to the detailed daily reports required; the surveillance of the operators' driving practices by the regional offices and road patrols; the requirement that National's insignia be painted on the tractors and that the equipment be used solely in National's business; the payment by National of half the cost of the uniforms worn by the drivers; the restriction on the use of other than owner-drivers to those approved by National; the method of as-

signment of runs; the payment of a 3% bonus for satisfactory results; the payment by National of "mileage taxes," certain license fees and insurance coverage; the manner of termination of the agreement; and other small operational details. At best, these and other factors referred to by the Labor Board are not controlling and appear to have been dictated by the desire of National to operate its business successfully.

Great stress is placed by the Labor Board upon the issuance of certain drivers' manuals by National to drivers in all classifications. The first manual was issued in 1951, and none were distributed or in force after 1956. We have carefully examined this contention and find that it is not controlling here.

We agree with National that this case, *on the facts*, falls squarely within the framework of Greyvan Lines v. Harrison, 7 Cir., 1946, 156 F.2d 412, as affirmed in United States v. Silk, 1947, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757. That decision is applicable here and is binding upon this court.

The Labor Board argues "that the Supreme Court has recently cast grave doubt on the continued vitality of Greyvan," and that "[i]n the light of [Local 24 of International Brotherhood of Teamsters Union v. Oliver, 1959, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312], it may well be doubted whether the Greyvan (Silk) decision should be accorded continuing force." We disagree. Oliver was concerned with the interpretation of a collective bargaining agreement between a group of local labor unions and a group of interstate motor carriers and whether a state antitrust law could be applied to prohibit the parties from carrying out its terms. We fail to see its relevance here.

Applying the rule announced in United States v. Silk, supra, and looking at "the total situation," *under the facts in the instant case*, we hold that the Contractors (contract-drivers) under the agreement with National are independent contractors, and that the Labor Board erred in its determination that they were em-

ployees within the meaning of Section 2(3) of the Act.

 While the determination of the remaining issue is not necessary to our disposition of this case, nevertheless we hold that the Labor Board properly refused to count the six challenged ballots received after the "deadline" set out in the notice of election. The Labor Board has wide discretion in establishing election procedure and safeguards, and the procedure adopted and followed here was entirely reasonable and cannot be said to have been arbitrary and capricious. National Labor Relations Board v. A. J. Tower Co., 1946, 329 U.S. 324, 330–31, 67 S.Ct. 324, 91 L.Ed. 322.

The order of the Labor Board must be and is set aside, and the cross-petition for its enforcement is denied.