HÉCTOR LANDRÓN ET AL., Plaintiffs and Appellants, *v.* PUERTO RICO LABOR RELATIONS BOARD, Defendant and Appellee; SAN JUAN RACING ASSOCIATION, Intervener and Appellee.

No. 69. Decided January 21, 1963.

*Víctor M. Bosch* and *Ismael Delgado González* for appellants. *J. B. Fernández Badillo, Solicitor General, Arturo Estrella, Assistant Solicitor General, José Orlando Grau,* and *Rafael*

*Buscaglia, Jr.* for the Labor Relations Board. *Jorge L. Córdova* and *Hernán R. Franco* for intervener.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

The Puerto Rico Labor Relations Board filed two complaints against the San Juan Racing Association, Inc. charging it with laying off, for union activities, racing agents Héctor Landrón, Salvador Colls, and Felipe Ayala, and, hence, with committing unfair labor practices within the meaning of subds. (a)[1] and (c)[2] of § 8 of the Puerto Rico Labor Relations Act (No. 130 of May 8, 1945, 29 L.P.R.A. § 69(a) and (c)). The respondent moved for dismissal of both complaints on the following grounds: (1) it challenged the jurisdiction of the State Board to take cognizance of the case; and (2) it alleged as a special defense that racing agents are not employees within the meaning of § 2 of the Act. The second question was sustained and, consequently, both complaints were dismissed. To review this ruling the corresponding petition for review was filed.

In the decision and order issued by the Board the existing relationship between respondent and the racing agents is described as follows:

"... For the purpose of increasing the total of the bets, respondent designates agents throughout the Island of Puerto Rico. The agents provide and pay the rental for the premises where it is installed. They pay light, water, telephone, and promotion expenses. They designate assistants, if deemed necessary, for whose services the agent pays and is responsible for their negligence. Respondent does not intervene in the designation of the assistant, in the salary nor in any other condition of his em-

---

[1] "To interfere with, restrain or exercise coercion upon, or to attempt to interfere with, restrain, or exercise coercion upon his employees in the exercise of the rights guaranteed in section 4 of this Act."

[2] "To encourage, discourage or attempt to encourage or discourage membership in any labor organization by discrimination in...firing..."

ployment. [The agents] provide all equipment and material necessary for the operation of the agency, with the exception of a punching machine and the *cuadros* and *papeletas* which are supplied by respondent. However, they must pay for the spoiled *cuadros* and *papeletas* and a rental of $10 monthly for every additional punching machine needed for the operation of the business. Although respondent has fixed the minimum hours during which the agency shall be open to the public, the agents may determine the maximum number of hours devoted to their agency. They may delegate, and actually delegate, the operation of the agency to their assistants or relatives. They may engage, and actually engage, in other noncompetitive business activities. They do not receive a fixed salary nor appear in respondent's payroll, nor is any deduction made to them for income tax, social security, and unemployment insurance. They receive as compensation 10 per cent of the total amount wagered plus four cents for every *cuadro* and three cents for every *papeleta*. This compensation is established by the Regulations of the Racing Commission of Puerto Rico. Their gains depend on the individual effort of each agent."

From the report of the trial examiner who presided the hearing and from the decision of the Board there appear other facts which it is necessary to consider jointly with those already recited in order to arrive at the determination of the crucial test involved in this appeal, the true status of racing agents in connection with the enterprise. It is well to point out that the San Juan Racing Association, Inc. has designated an agency inspector to verify whether the agencies meet the necessary requirements as to physical facilities, even though the evidence showed that the inspections are not frequent. The enterprise periodically remits instructions to the agents on the preparation, repair, and renewal of the premises where the agency [3] is established and on the preparation and delivery

---

[3] Examples are the instructions on the rectangular or quadrangular shape of the agencies, accommodation of the equipment, necessity for a counter, specification of the billboard to be placed on the exterior of the agency, general interior and exterior appearance of the premises, and other facilities to be made available to the public.

of the material bet.[4]  Meetings were held to acquaint the agents with the functioning and coordination of the work. Among the agents are persons who are absent, professionals, public employees, and charity associations.

---

[4] The trial examiner makes reference to the circulars sent out by the enterprise on the following matters:

1. Manner of punching the cards.
2. Manner of making remittances.
3. Manner and time for delivering the material in the "pool" offices.
4. The need that the *cuadros* and *papeletas* bear the stamp delivered by the San Juan Racing to the agents.
5. Notice of the imposition of fines for the *cuadros* and *papeletas* ruined by the agent's negligence.
6. Place where the agents must call for the official programs of the races.
7. Inventory of punching machines in possession of the agents and warning to adopt disciplinary measures for failure to make such inventory.
8. Manner in which the agents shall make the liquidations.
9. Need to deliver the original as well as the copy of the void *cuadros* and *papeletas*, otherwise they would have to pay the value thereof.
10. Procedure to be followed whenever a bettor loses the duplicate of a *cuadro* or *papeleta* wagered.
11. Procedure to be followed by the agents whenever a *cuadro* is altered.
12. Need that the agents deliver the material in the metal boxes furnished by San Juan Racing for that purpose.
13. Prohibition to agents to pay winning *cuadros* or *papeletas* wagered in another agency, warning them that otherwise his agency license may be forthwith cancelled.
14. Payment of winning *cuadros* or *papeletas* purchased in other agencies under certain conditions.
15. Need that the *cuadros* and *papeletas* be sold in consecutive numerical order.
16. Need that the agents call at the "pool" office for the check sheets of *cuadros* and *papeletas* of the material sold in the agencies.
17. Payment of winning *papeletas* and *cuadros* in the "pool" offices.
18. Sale of *dupletas* in the racing agencies.
19. Need to deliver the material in consecutive numerical order and that the agents check the cards received by them to verify that they are in order.
20. Renewal of weekly meetings in the "pool" office.
21. Need that the agents use in numerical order the cards delivered by San Juan Racing, advising them that the agent who fails to comply with the instructions will be held responsible.
22. Information required of agents for the purpose of submitting statistics to the Legislature of Puerto Rico.

██ The definition of the term "employee" contained in § 2 of the Act, 29 L.P.R.A. § 63,[5] is worded in the broadest terms possible, and only admits as express exceptions that of individuals employed in the domestic service or in the service of their parents, spouse, and the executives and supervisors. We therefore see that, unlike the situation under the federal legislation since the enactment in 1947 of the Taft-Hartley Act (§ 2(3), 29 U.S.C. § 152(3)), our statute does not expressly exclude independent contractors.[6] The amendments incorporated on that date were not limited to establishing the exclusion of independent contractors from the category of employees, but according to the legislative history of the measure [7] the National Board is instructed to apply the ordinary tests of the common law of agency in determining the status of the employee covered by its provisions or of independent contractor. Until then the courts as well as the Board had departed from the common-law rules in making such determination and rather rested on the broad purpose of the Act to protect and promote collective bargaining. Thus, *National Labor Relations Board* v. *Hearst Publications, Inc.*, 322 U.S. 111 (1943), announces the criterion

---

[5] "The term 'employee' shall include *any employee* and shall not be limited to employees of a particular employer, unless the Act expressly provides to the contrary; and shall include any individual whose work has ceased as a consequence of or in connection with any labor dispute, or because of any unfair labor practice."

On the definition of the term "employer," compare *Labor Relations Board* v. *Club Deportivo*, 84 P.R.R. 495 (1962).

[6] The provisions of the Wagner Act did not expressly exclude independent contractors as employees, but the National Board's interpretation did. *East Shore Newspapers, Inc.*, 55 N.L.R.B. 993 (1944); *The Kelly Co.*, 34 N.L.R.B. 325 (1941).

Of the 13 state jurisdictions having local laws on the matter, the exclusion of the independent contractor appears expressly in the statutes of Colorado, Hawaii, North Dakota, Oregon, and Wisconsin. See Prentice-Hall, Labor Relations, State Laws, p. 42,001 *et seq.*

[7] See footnote 11 of the opinion delivered in *National Labor Relations Board* v. *Steinberg*, 182 F.2d 850, 854-55 (C.A. 5, 1950), in which there is copied from the reports of the Labor Committee of the House of Representatives and the Conference Committee which considered the bill.

that in order to decide whether or not a person is an employee within the coverage of the statute, the determination of his economic condition in relation to another carries weight, so that the purposes underlying the statute call for his protection; in other words, the economic facts may outweigh the traditional legal distinctions of the common law.[8]  See note in 17 Geo. Wash. L. Rev. 404 (1949).

The common-law test applied is that of "control retention." In *Kansas City Star Co.*, 76 N.L.R.B. 384 (1948), first case on independent contractor decided by the National Board after the 1947 amendments, that agency laid down the rules to be followed in accomplishing the congressional purpose, and as to independent contractors it said, citing from the report of the Labor Committee of the House of Representatives of the United States on the bill which became the Taft-Hartley Act *supra*, that it comprised those persons (1) who undertake to do a job for a sum certain; (2) decide how the work will be done; (3) usually hire others to do the job; and (4) depend for their income, not upon wages, but upon what they may receive.  See *National Van Lines, Inc.* v. *N.L.R.B.*, 273 F.2d 402 (C.A. 7, 1960) ; *Los Angeles Evening Herald and Express*, 102 N.L.R.B. 103 (1953) ; *National*

---

[8] In *Sec. of Labor* v. *Pedro A. Pizá, Inc.*, 86 P.R.R. 423 (1962), the question involved was the determination of whether appellee's selling agents on commission were entitled to vacation with pay under the applicable minimum wage decrees.  The defense set up was that the existing relationship was that of principal and independent contractors.  In rejecting this contention, we said that "Above all, it is well to anticipate that the traditional common-law concept on the main characteristics of an independent contractor should not be applied strictly in the construction of statutes regulating minimum wages and working conditions."

On the other hand, for the purposes of fixing civil liability in actions for damages we have adopted the common-law rules of agency as respects independent contractors.  *Bonet* v. *Municipality of Barceloneta*, 87 P.R.R. 74 (1963) ; *Morales* v. *Castro*, 85 P.R.R. 275 (1962) ; *Mariani* v. *Christy*, 73 P.R.R. 729, 742-45 (1952).  Also, in matters of compensation for labor accidents, *Atiles, Mgr.* v. *Industrial Commission*, 68 P.R.R. 107 (1948) ; *Atiles, Mgr.* v. *Industrial Commission*, 63 P.R.R. 573 (1944) ; *Montaner, Mgr.* v. *Industrial Commission*, 59 P.R.R. 284 (1941) ; *Romero, Mgr.* v. *Industrial Commission*, 57 P.R.R. 343 (1940).

*Labor Relations Board* v. *Steinberg,* 182 F.2d 850 (C.A. 5, 1950), points out that the employer-employee relationship exists only where the employer has the right to control and direct the work, not only as to the final result, but also as to the manner and means by which the result is accomplished. See, also, *United Insurance Company of America* v. *N.L.R.B.,* 304 F.2d 86 (C.A. 7, 1962) ; *A. S. Abell Co.,* 137 N.L.R.B., No. 36 (1962) ; *Mound City Yellow Cab Co.,* 132 N.L.R.B. 484 (1961) ; *Lindsay Newspapers, Inc.,* 130 N.L.R.B. 680; *Buffalo Courier-Express, Inc.,* 129 N.L.R.B. 932 (1960) ; *American Broadcasting Co.,* 117 N.L.R.B. 13 (1957) ; *The H. E. Koontz Creamery, Inc.,* 102 N.L.R.B. 1619 (1953) ; *Golden State Agency, Inc.,* 101 N.L.R.B. 1775 (1952) ; *Oklahoma Trailer Convoy, Inc.,* 99 N.L.R.B. 1019 (1952).[9]

According to the interpretations in federal cases, in determining whether a person is an independent contractor or an employee different factors have been considered: (a) the degree of control in the performance of the work, *N.L.R.B.* v. *Nu-Car Carriers, Inc.,* 189 F.2d 756 (C.A. 3, 1951) ; *Golden Age Dayton Corp.,* 124 N.L.R.B. 916 (1959) ; *Serv-Us Bakers of Oklahoma,* 121 N.L.R.B. 84 (1958) ; *Albert Lea Cooperative Creamery Ass'n,* 119 N.L.R.B. 817 (1957), and cases cited in the preceding paragraph; (b) manner of remuneration, *N.L.R.B.* v. *Nu-Car Carriers, Inc., supra; La Prensa, Inc.,* 131 N.L.R.B. 527 (1961) ; (c) the power to engage and the right of discharge, *Ivory Pine Co. of California,* 107 N.L.R.B. 19 (1953) ; *San Marcos Telephone Co.,* 81 N.L.R.B. 314 (1949) ; (d) opportunity for profit and risk taken, *Site Oil Co. of Missouri,* 137 N.L.R.B., No. 145 (1962) ; *Island Services, Ltd.,* 50 L.R.R.M. 1213 (1962) ; *Air Control Products,* 132 N.L.R.B. 114 (1961) ; (e) ownership of equip-

---

[9] The characterization or connotation made by the parties respecting the nature of the contract is not determinative. *National Labor Relations Board* v. *Keystone Floors, Inc.,* 306 F.2d 560 (C.A. 3, 1962) ; *American Broadcasting Co.,* 117 N.L.R.B. 13 (1957) ; *Eldon Miller, Inc.,* 107 N.L.R.B. 557 (1953) ; *cf. Cassasús* v. *Escambrón Beach Hotel,* 86 P.R.R. 356 (1962).

ment and dependence on the facilities furnished by the principal, *Island Services Ltd., supra; Malone Freight Lines, Inc.,* 107 N.L.R.B. 501 (1953); *Eldon Miller, Inc.,* 107 N.L.R.B. 557 (1953); (f) tax withholding, *Coca Cola Bottling Co.,* 133 N.L.R.B. 762 (1961); *American Broadcasting Co., supra.*

■ However, it can not be asserted that a particular requisite is determinative nor that there is a uniform rule which may readily apply to reach the desired conclusion. It is necessary to examine carefully the total situation of the facts and, in the end, to resort to the talismanic test prevailing in this field, that of control retention. *United Insurance Company of America* v. *N.L.R.B.,* 304 F.2d 86 (C.A. 7, 1962); *N.L.R.B.* v. *Blount,* 131 F.2d 585 (C.C.A. 8, 1942). Precisely petitioners devote the greater part of their elaborate brief to analyzing separately each one of the factors relied on by the Board and to point out—supported by interpretations of the Federal Act—that the absence or presence of each individual factor does not detract from the status of employee. We repeat, however, that the correct approach is to consider the total of circumstances, since except for rare instances such a sharp distinction between an employee and an independent contractor can not be drawn with infallible certainty. Normally in this type of relationship there are indistinct characteristics of either classification. That is why it is necessary to make an analysis of all the circumstances in order to be able to form a judgment which is nearest to the reality.

Independently of the determination on "control retention" which it is necessary to make, one of the peculiarities which contributes to complicate the decision of the present case consists in the intervention of the State's police power, through the regulations approved by the Racing Commission to govern the different phases of the racing sport, in the existing relationship between the enterprise owner of the race track and the racing agencies. This intervention is manifested precisely in areas of significant importance such as

that connected with the designation and substitution of agents, the fixing of their compensation, the posting of bond by the agents to protect the interests of the enterprise, and the fixing of the amount to be charged by the enterprise to the agents on the income from *cuadros*, *papeletas*, and daily doubles. In this connection, the existing Racing Regulations at the time of the occurrence of the acts which gave rise to the complaints provided that a natural or juridical person who operated a race track could designate agents, but such appointments were subject to the approval by the Commission (15 R.&R.P.R. § § 184–312(b) and 184–360) ; that the entity operating the race track could not "close down" any existing agency without the previous authorization of the Commission (15 R.&R.P.R. § 184–312 (b) ) ; that the agents would receive as compensation a commission to be determined "from time to time" by the Commission in accordance with the circumstances, "such commission to be in any event a certain percentage of the total amount of the combinations which the agent or agents may stamp in their respective agencies" (15 R.&R.P.R. § 184–315) ; that at the request of the enterprise the agency in charge of the administration of the racing sport could fix, after holding a public hearing, a bond to be posted by the agents "for the protection of its interests" (15 R.&R.P.R. § 184–318) ; that the price to be charged for the printed materials for *cuadros*, *papeletas*, and daily doubles could be fixed by the owner of the race track and the agents, subject to the approval by the Commission (15 R.&R.P.R. § § 184–361, 184–362, and 184–415) ; and, lastly, it was the agents' duty to account for all printed material delivered to them and to return the void material (15 R.&R.P.R. § 184–415).

The Racing Regulations of 1962 [10] enhances even more the participation of the agencies in charge of the administra-

---

[10] Approved by the Racing Board on December 14, 1961; by the Governor on February 23, 1962; and filed in the State Department on April 2, 1962, as of which it is in force.

tion of the racing sport—the Racing Board and the Administrator—in the existing relationship between the San Juan Racing Association, Inc. and the racing agents. In addition to the situations pointed out in the preceding paragraph which are preserved substantially in the existing regulations,[11] it is expressly provided that not only the designation and retirement of agents shall be subject to approval by the Administrator, but also their suspension and the transfer of agencies (§ 602) ; it is the duty of the enterprise to furnish to the agents all of the material necessary for betting, such as *cuadros*, *papeletas*, registration sheets and official programs, and in case of conflict the Administrator shall determine the needs of the agency (§ 603) ; the Administrator is vested with power to fix the hour of closing bets in the agencies (§ 606) ; the Administrator is authorized, at the request of either party, to revise the charges and amounts that the enterprise charges to the agents for the material and use of the equipment for betting and daily double wagers (§ § 609 and 708) ; and the agents must account for all forms delivered to them (§ § 628 and 709).

■ Lastly, let us examine the contentions of our Labor Relations Board in those situations in which the question on independent contractors has been raised.[12] In *Buena Vista Dairy, Inc.*, D-174 (decided November 20, 1957), although reference is made in the initial statement to the rule announced in *Hearst Publications, Inc., supra*, and it is asserted that "The Board, in discharging the responsibility of defining the terms 'employer' and 'employee' must consider the economic realities in the light of the objectives pursued by the Legislative Assembly and preclude the employers, in creating

---

[11] Articles 602 (on designation and retirement of agents), 604 (on fixing of compensation or commission), and 610 (on posting of bond).

[12] In the cases of assistant croupiers the question whether they were independent contractors was not raised. *Hilton Hotels International, Inc.*, D-167 (decided March 18, 1957) ; *San Juan Intercontinental Hotel*, D-193 (decided September 17, 1958).

the relationship with persons who aid them in the production and distribution, from resorting to legal technicalities to place outside the protection of the Act those who otherwise are employees," it decides that the milk sellers of the enterprise are employees because "it exercises over them *a degree of control* almost as broad as that which it exercises over the other chauffeurs and retains the power to apply disciplinary measures," and then it goes on to examine a series of factors in determining the extent of this degree of control. In *Puerto Rico Racing Association*, D-190 (decided September 3, 1958), the question was whether the jockeys are considered independent contractors in their relations with the horse owners. In dismissing this allegation of appellees, the Board said that "In order to decide whether or not a person is an employee within the scope of the statute, it is important to determine whether his economic condition is such in relation to another that the purposes sought by the Act require that he be protected [citation]. Contrary to the employers' contention, the fact that a person is an independent contractor according to conventional criteria does not exclude him automatically from the protection of the Labor Relations Act," and applying the test of "control retention" as well as that of "economic condition," it held that the jockeys were employees covered by the Act. As to this last aspect, it was said that there was a "marked inequality" in the capacity to negotiate on wages and other working conditions between the jockeys and the horse owners, and that, notwithstanding the existence of regulatory provisions which guarantee a minimum compensation to those who are not within the first five to arrive, they did not actually receive any pay; that, with respect to their income, jockeys depend on the horse owners as does any other employee and, therefore, the right to organize themselves for the purpose of bargaining was essential in their case.

■ Accepting, for the purposes of this petition, the administrative interpretation on the scope of the definition of the term employee, we must decide, in the light of the foregoing, (a) whether racing agents are independent contractors as respects the enterprise which operates the race track; and (b) in the affirmative, whether, even if they are independent contractors, the extension of the benefits of the application of the Act by reason of their "economic condition" with respect to the enterprise is warranted in their case. In this connection, the respondent Board's determination on both questions deserves our respect and consideration. *Labor Relations Board* v. *Club Deportivo*, 84 P.R.R. 495 (1962); *Labor Rel. Board* v. *Junta de Muelles*, 71 P.R.R. 143 (1950); *N.L.R.B.* v. *E. C. Atkins Co.*, 331 U.S. 398 (1947). *Cf. South P.R. Sugar Co.* v. *Sugar Board*, 82 P.R.R. 814, 831 (1961).

■ Considering all the circumstances as a whole, there is no question that the enterprise retains some degree of control over the racing agents' activity, but these elements are not sufficient to place them in the category of employees. As correctly pointed out by the Board, the written instructions transmitted to the agents are expressly designed to achieve uniformity in the physical appearance of the premises, greater efficiency and promptness in the operation of the business as a result of the mechanized "pool" system, and greater protection to the public in order to win the bettors' confidence. "This controls the final result, not the medium," says the decision, a criterion which we share. On the other hand, the principal elements tend to point out the absence of effective control: there is no unlimited power to designate or suspend the agents; there is no determination of their income or of the basic working conditions nor of their personal time or activity; there is no intervention in the designation of the assistants; the enterprise does not participate in the losses which may be sustained in the operation of the agen-

cies, and others. It must necessarily be concluded that the position adopted by the Board in classifying as independent contractors is well founded.

Having established the fact that the agents are independent contractors, it remains to consider whether we must recognize to them the protection granted by law in applying the "economic condition" test. It certainly is not easy to delimit the scope of this concept; however, considering the statements in the *Hearst* case, we can assert that it involves essentially a situation of economic dependence so that in effect the principal controls practically the amount received for work performed. In other words, the determination of the independent contractor's income depends exclusively on the discretion of the principal. The Board points out that this situation is not present in the case of racing agents. It says: "The respondent has no control over the racing agents' income. The commission to which they are entitled is regulated by the Racing Commission [now the Racing Board]. No sales limit is required of them nor do they have to devote all their time to the agency business. The record actually reveals that about 75 per cent of the racing agents are engaged in other gainful activities." Considering all the circumstances, we can not hold that the facts point to a situation of abandonment and want of protection requiring the application of the Act, considering especially that the main aspects are controlled by regulation of another government agency for the affined purpose of affording due protection to all interested parties.

The conclusions which we have reached make it unnecessary to pass upon the jurisdictional question raised. See, however, *Walter A. Kelley*, 139 N.L.R.B., No. 56 (1962); *Meadow Stud, Inc.*, 130 N.L.R.B. 1202 (1961); *Hialeah Race Course, Inc.*, 125 N.L.R.B. 388 (1959); *Los Angeles Turf Club, Inc.*, 90 N.L.R.B. 20 (1950); cf. *Puerto Rico Telephone v. Labor Relations Board*, 86 P.R.R. 362 (1962).

YALE LAW LIBRARY

100

Petitioners' point of view has been ably presented; that of the Board and the intervener has been valuable.

The order issued by the Labor Relations Board on February 25, 1960, will be affirmed.