## GREYVAN LINES, Inc., v. HARRISON.
### No. 8779.

Circuit Court of Appeals, Seventh Circuit.
July 12, 1946.

Sewall Key, Acting Asst. Atty. Gen., and Homer R. Miller, Asst. to Atty. Gen., A. F. Prescott, Sp. Asst. to Atty. Gen., and J. Albert Woll, U. S. Atty., and John B. Stephan, Asst. U. S. Atty., both of Chicago, Ill., for appellant.

George T. Christie, of Chicago, Ill., and Wilbur E. Benoy, of Columbus, Ohio, for appellee.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

SPARKS, Circuit Judge.

The Greyvan Lines, Inc., sued to recover certain amounts alleged to have been wrongly assessed and collected for social security taxes under the alleged authority of the Social Security Act, 42 U.S.C.A. §§ 1001 and 1101. The District Court found that the persons on whose alleged wages the taxes were paid were independent contractors rather than employees, and accordingly entered judgment for their refund, and from that judgment, the Government appeals.

The taxpayer is an Indiana corporation organized to engage as a common carrier in the business of transporting household and other goods by motor truck in thirty-eight states and into certain Canadian provinces. It was authorized to conduct its business in the United States under the grandfather clause of the Motor Carrier Act, 49 U.S.C.A. § 301 et seq., and the various Acts and regulations of the states in which it operated. It filed its return as an employer and paid taxes pursuant thereto. The Collector, however, claimed additional taxes as to certain individuals referred to here as truckmen, and helpers engaged by them, and it is as to the status of these individuals that the controversy is presented. The taxpayer contends that the truckmen operated as independent contractors, and their helpers were their own employees, while the Collector contends that the truckmen and their helpers alike bore an employee relationship to the taxpayer.

The court found that as early as 1930, the Company developed a system whereby the transportation of goods entrusted to it for such transportation was contracted to suitable, responsible owners of motor vehicle equipment residing in the various states in which it did business.

The contracts under which these owner-operators worked provided for exclusive service for themselves and their equipment, including their motor vehicles and all necessary paraphernalia and materials for the business, and that in connection with this exclusive service, the truckmen would comply with all rules, regulations and instructions of the Company. The trucks were required to be painted with certain colors and insignia as designated by the Company. The contract further provided that the truckman would hire any labor required incident to pick-up, loading and delivery of shipments "at his own expense and in his own employ and which shall be under his direction and control." He was to personally drive his truck or trucks except that he was permitted to use a competent helper as a relief driver, and, in case of unforeseen circumstances, he might, upon notifying the Company and obtaining its approval, employ a substitute, but he or the approved substitute was required to remain on the truck.

The truckmen were required to furnish fire, theft, collision, public liability and property damage insurance at their own expense, and the Company was authorized to place all such insurance for the truckmen and charge their accounts for it. The Company was to furnish necessary cargo insurance. Each truckman was to furnish a $1000 bond to cover himself and his substitute driver, if any, and he was also required to deposit $250 to be held until final settlement of all accounts. Unless special credit was arranged by the shipper, collections were to be made on all deliveries by the truckmen according to instructions furnished with each shipment. All claims for loss or damage not covered by cargo insurance were to be charged to the account of the truckman, and the contract required that notice of such claims be given to him immediately in order to enable him to clear himself of responsibility if possible, and if he established his non-liability for a claim theretofore paid, his account was to be credited for the amount paid in settlement.

All operating costs, which were listed by the contract to include property taxes, resident vehicle license, fuel, tires and repairs, were to be borne by the truckman, while the Company was to furnish all permits and licenses for operation in its service as a motor carrier under federal or state laws.

The contract further provided that all contracts or bills of lading should be in the

name of the Company, and if the truckman obtained any business himself, he must notify the Company to enable it to make the contract in its own name. If the truckman did any hauling for anyone other than the Company his contract would be subject to termination for breach. The Company was authorized to charge to the truckman's account any expense incurred by it for his express benefit.

Remuneration was provided for in accordance with a Rate Schedule, a current copy of which was attached to the contract, and it was further agreed that the schedules would not be changed, nor would any rules be adopted by the Company which would result in reducing the income, as provided by the schedule, without the written consent of the duly authorized representative of the truckman. This remuneration was a percentage of the predetermined tariff charges, from 50% to 52%, plus a bonus up to 3% of the tariffs.

The contract was subject to cancellation at any time upon written request of the truckman or written notice by the Company.

In 1942, the Collector of Internal Revenue amended and supplemented the Company's returns for taxation under Titles VIII and IX of the Social Security Act, 42 U.S.C.A. §§ 1001 et seq., 1101 et seq., assessing additional taxes based on a determination that the Company had paid taxable wages during the period from 1937 to 1942 which had not been included in the returns originally filed by it. The basis used for the assessment was an average wage for each truckman of $36 a week for forty-four weeks a year up to January 1, 1942, and $42.50 a week thereafter, those being the union wage scales. For the helpers, it was determined that their wages would be 41.67% of the amount determined for the truckmen's wages. The total amount calculated was $181,866, on which taxes and penalties were assessed.

The parties stipulated as to the mode of calculating the additional taxes assessed, but not their correctness. In addition, the evidence consisted of certain exhibits and the testimony of a number of witnesses. From this evidence the court rendered findings of fact including the following which appellant challenges: The truckmen were not employees of taxpayer but were independent contractors; they travelled long distances from its place of business and were on the road for long periods of time and it was therefore impracticable and impossible for taxpayer to exercise control over the means and manner of the transportation, loading and unloading of the goods; some of the truckmen were partnerships and the contract payments to them were not assessable under the Act; the relationship of employer and employee did not exist between taxpayer and the truckmen or between taxpayer and persons employed by the truckmen; the truckmen were engaged in business of their own; the degree of control over the hiring, paying, managing and discharging of helpers stamps the employer-employee relationship as existing only between the truckman and his helpers; no control by the taxpayer over the truckman or his employees existed in any way inconsistent with the contract provisions; and the directions that were shown to have been given the truckmen were centered about the requirements provided by law for safety to the public and the safe transportation and delivery of the goods entrusted to the taxpayer's custody.

Appellant contends that in determining these facts the court failed to give effect to important provisions of the contracts which it asserts clearly show the reservation of the right of control over the truckmen and their helpers as to the methods and means of their operations which, it is agreed, furnish the test for determining the relationship here in question. Appellant calls attention to a manual which was furnished to each truckman giving very detailed instructions which do go far to indicate the control it seeks to establish. For instance, the manual provided that no truckman might turn his van over to his helper or other person without specific authority from the General Office; that when drivers were on parking lots and had time available it was expected that they would help other drivers in loading and unloading without additional compensation; that in case they were operating into or out of any location where there was a strike in prog-

ress, the truckman must get in contact with the union representative and obtain and abide by his instructions; that they must patronize designated parking lots and purchase as much gas as possible from such lots; that they must take the most practicable routes between points except as otherwise dispatched. The manual also provided rather specific procedure to be followed from the time the truckman received his instructions to load until he finished the job and prepared for another. It described a uniform said to have been adopted by the Company, although it did not say by whom it must be worn.

While it is true that many provisions of the manual, if strictly enforced, would go far to establish an employer-employee relationship between the Company and its truckmen, we agree with appellee that there was evidence to justify the court's disregarding of it. It was not prepared until April, 1940, although the tax period involved was from November, 1937, through March, 1942, and there was no evidence to show any change or tightening of controls after its adoption and distribution; one driver testified that he was never instructed to follow the rules therein provided; an officer of the Company testified that it had been prepared by a group of three men no longer in their employ, and that it had been impractical and was not adhered to.

Appellant also contends that appellee obtained its certificate of public convenience and necessity for operation as a common carrier on the strength of assertions of its counsel in 1935, that the relationship of employer-employee existed between it and its truckmen. A reading of the opinion of the Commission published at that time does not bear out this contention. See Greyvan Lines, Inc., Common Carrier Application, 32 M.C.C. 719. It appears to us that the Commission clearly contemplated the use by the Company of leased equipment, *operated* by the owners thereof, under the *direction* of "applicant's *own* employees," who caused the drivers to comply "with such company rules as would insure efficient operation." We do not understand that § 206 of the Interstate Commerce Act, as added in 1935, 49 U.S.C.A. § 306, requiring the issuance of a certificate of convenience and necessity for all common carriers by motor vehicle, requires that such carriers may operate only through their own employees, as distinct from independent contractors, so long as such independent contractors operate under the general supervision of the carrier's employees. § 303 which defines the term "common carrier by motor vehicle" (§ 303, subd. (a) (14), also defines "services" and "transportation" to which the chapter applies to include "all vehicles operated by, for, or in the interest of any motor carrier irrespective of ownership or of contract. * * *" (§ 303, subd. (a) (19). In view of these definitions, we find nothing inconsistent in the operation of a common carrier service through the medium of independent contractors, as here engaged.

Appellee relies very strongly upon United States v. Mutual Trucking Co., 141 F.2d 655, where the Court of Appeals for the Sixth Circuit affirmed a judgment, 51 F. Supp. 114, for refund of taxes held to have been illegally collected from another trucking company which carried on its business through owner-operators. Appellant says the facts are very different. It is true that the facts there do not present as close a question as in the case at bar. There it appears that the trucking company was a *contract,* rather than a *common* carrier, and the contract under which the company and its truckmen operated specified that the latter were contractors only, and not agents or employees of the company, and also that the owner-operators assumed full responsibility for all social security taxes, and the evidence showed that eleven of them actually paid such taxes on the wages of their helpers. Even so, we think the reasoning of the court applies with equal force here as to the significance of the control of the owner-operators over the helpers engaged by them. We think the true employer-employee relationship arises at that level in both cases (Williams v. United States, 7 Cir., 126 F.2d 129), and that the Company cannot be held liable for employment taxes on the wages of persons over whom it exerts no control, and of whose employment it has no knowledge. And this element of control of the truckmen over their own

helpers goes far to prevent the employer-employee relationship from arising between them and the Company. While many factors in this case indicate such control as to give rise to that relationship, we think the most vital one is missing because of the complete control of the truckmen as to how many, if any, and what helpers they make use of in their operations. Except for the actual driving of the trucks, the contract imposes no restrictions whatever on the employment of helpers. We think it cannot be said that a truckman to whom is left the determination of whether to do the work himself or engage others to do it is a mere employee. And when no report is required or expected as to those helpers, their identity, the work performed by them, their hours of work, we think the Company cannot be required to pay employment taxes based on their labor. The breaking down of the payments to the truckmen to differentiate between wages and profits from the use of their equipment appears to us to be equally arbitrary.

We agree with the District Court that the relationship of employer and employee did not exist between the Company and the truckmen or their helpers. We find no error in the findings challenged by appellant.

Judgment affirmed.