623 P.2d 810

Howard and Geneva SMITH, doing business as Arizona Mobile Home Movers, Plaintiffs-Appellants,

v.

ARIZONA DEPARTMENT OF ECONOMIC SECURITY; John L. Huerta, Director of Economic Security; R. D. Sorenson, Chairman of Appeal Tribunal; Charles N. Vance, Manager of Contribution Section and Gerald W. Korte, Department Representative, Defendants-Appellees.

No. 1 CA–CIV 4599.

Court of Appeals of Arizona,
Division 1,
Department A.

Nov. 4, 1980.

Rehearing Denied Dec. 19, 1980.

Hill & Savoy by Cheryl K. Hendrix, Phoenix, for plaintiffs-appellants.

Robert K. Corbin, Atty. Gen., by Frank J. Sagarino, Asst. Atty. Gen., Phoenix, for defendants-appellees.

Molloy, Jones, Donahue, Trachta, Childers & Mallamo, P. C., by Frederic A. Luyties, III, Tucson, for Transit Homes, Inc., amicus curiae.

## OPINION

DONOFRIO, Judge.

This is an appeal from the judgment of the superior court which affirmed the final administrative decision of the Department of Economic Security. The superior court held that the services performed by drivers and helpers in moving and setting up mobile homes constitutes employment for Howard Smith and Geneva Smith, dba Arizona Mobile Home Movers, as defined in A.R.S. § 23–615; remuneration of these services constituted wages within the meaning of A.R.S. § 23–622; that appellants were employers subject to the Employment Security Act with coverage commencing January 1, 1971, as defined by A.R.S. § 23–613. We reverse the judgment of the superior court.

Appellants, Howard Smith and Geneva Smith, dba Arizona Mobile Home Movers (hereinafter referred to as AMHM), have been engaged in the business of transporting mobile homes within the State of Arizona under a certificate of convenience and necessity issued by the Arizona Corporation Commission since approximately 1970. In transporting mobile homes a trailer-tower truck is used. AMHM owns and operates one such truck and leases other trucks. In order to be engaged in the transportation of mobile homes, AMHM must possess a certificate of convenience from the Arizona Corporation Commission. The commission issues the certificates based upon the character and fitness of a person and his financial responsibility. This certificate may be revoked or suspended for safety violations or for hauling beyond the scope of its authority. The certificate can only be used by the person to whom it is issued. In order to receive this certificate, AMHM must follow the motor vehicle safety regulations promulgated by the Arizona Corporation Commission. These rules and regulations provide in pertinent part that: an authorized carrier is required to have the name of the carrier displayed on the leased vehicle; before any person other than the regular employee of the authorized carrier is assigned to drive equipment, the authorized carrier must be certain that the driver is familiar with the motor carrier safety regulations of the Federal Highway Administration and that his employment as driver will not result in the violation of these regulations; all advertising, whether in the telephone directory, newspapers, display cards or business cards, shall be in the name of the person holding the certificate; all authorized carriers for mobile home moving shall maintain and file with the Arizona Corporation Commission a certificate for cargo insurance for $7,500 or satisfactory proof of ability to pay damages of $7,500 for each mobile home; all authorized carriers for mobile home moving shall be in full control and exclusive possession of all equipment whether owned or leased; the bill of lading must show the entity performing the transportation; a driver must have the lease, the bill of lading and the log book in the vehicle; the driver of the vehicle must have a doctor's certificate that he is physically qualified to drive a commercial vehicle; the driver is required to turn the log book over to the carrier, and the carrier is required to know the hours he has been driving as reflected by the log.

AMHM and the drivers enter into two forms of written agreements. One form entitled "lease of motor vehicle equipment" is furnished by the Arizona Corporation Commission to be executed by the parties and put on file with the Commission. This lease designates the owner of a motor vehicle as lessor and the authorized carrier as the lessee and describes the vehicle by year, make, serial number and license number. The lease provides substantially that: the lessor leases this specified vehicle to lessee for an agreed period (not less than six months); either party may cancel the lease on 15 days notice to the other party and to the Corporation Commission; the vehicle shall be under the complete control of AMHM during the existence of the lease, and vehicle license plates issued by the Arizona Corporation Commission will be issued in the name of AMHM and removed from the vehicle upon termination of the lease.

The other contract is entitled "lease truck-operator agreement." It provides that: the driver shall retain an agreed percentage of the gross income on the freight and pay the balance to AMHM before the 10th of each month; the driver shall pay AMHM a guaranteed minimum of $150 each month; AMHM shall provide public liability and property damage insurance on the truck and cargo while in transit and when empty, provided that the truck is being driven by the insured driver; all other insurance shall be provided by the driver; the driver shall have AMHM decals on both sides of its truck; the driver agrees to make himself familiar with the laws pertaining to the movement of mobile homes; the driver will keep accurate records as requested by AMHM and proper logs according to the Arizona safety regulations; the equipment will be serviced and kept in good condition; the records and equipment may be inspected at any reasonable time; the freight manifest must be made out before movement of any trailer with accurate mileage rates and addresses; repeated violations of laws and regulations pertaining to intrastate driving for a licensed carrier will result in immediate termination of the contract, and failure to pay the agreed percentage to AMHM of all the charges will result in immediate termination of the contract by AMHM.

The truck drivers own their own trucks and tools. The tools alone constitute an investment of approximately $1,500. AMHM does not provide any tools or equipment to the truck owners. The truck owners pay their own license and registration fees on their trucks and pay all gas and oil along with all upkeep and maintenance of the trucks. They also provide their own comprehensive and collision insurance.

Due to the regulatory requirement that all advertising be placed in its name, AMHM acts as an agent for the truckers by advertising mobile home moving services. If a shipper wants a mobile home moved, he can contact AMHM who in turn posts the name of the shipper on the bulletin board. The truck owner may have his own clientele who contact him personally when they have a mobile home to be moved. The truck owners or their drivers are free to choose which moves they want to make; they are under no obligation to provide service to anyone. The drivers/owners can accept or reject any move. The truck owners are not required to report for work or to work any specified hours.

If a truck owner selects a moving job, it is his responsibility to contact the shipper and make all necessary arrangements. The driver of the truck determines what route he will take in making the move. If an escort service is needed, the driver makes the arrangements for acquiring such service and pays for the service without any help or knowledge on the part of AMHM. The escort service is under the direction and control of the truck driver. He is not required to account to the plaintiff or provide any receipts regarding these services. If a permit is needed to haul a wide load, the driver acquires and pays for the permit and is reimbursed for this expense by the shipper as part of the total moving expense. If the truck owner hires an assistant to drive the truck, then the owner is required to provide AMHM with information regarding his driving qualifications. This reporting requirement is necessary to comply with regulations imposed by the Arizona Corporation Commission. The truck owner is responsible for any and all damage that may result from the move, whether damage to his truck or to the unit being moved.

An ancillary part of the mobile home involves dismantling a mobile home prior to the move and reassembly after the move is completed. This activity is known in the trade as "take-downs" and "set-ups" and requires a C–10 license issued by the Division of Building Codes in the office of the Registrar of Contractors (Registrar of Contractors terminated by A.R.S. § 41–2361 as of July 1, 1980).

A take-down involves jacking the mobile home up, putting tires on it, removing the block that it sits on, and disconnecting the utilities. The set-up involves taking the tires off, loading the unit, setting it on

blocks, leveling it and reconnecting the utilities. To perform this work, some of the truck owners have their own license, while others operate under someone else's license. They may form a partnership with the appellant and operate under its license. It is only when the truck owner uses AMHM's license that the appellant is paid.

In doing these take-downs and set-ups, sometimes the truck owner hires a helper to assist. The driver hires his own helper. Furthermore, the driver pays the helper without direction or control or restrictions by AMHM.

The Arizona Corporation Commission determines the tariff to be paid the drivers by the shippers. The final determination of the price to move a mobile home is made by the driver when he fills out the freight manifest. It is the responsibility of the truck owner to submit a bill to the shipper and collect the money. At the end of the accounting period, the truck owners remit the agreed upon percentage of the freight charges to AMHM. Checks made out by the shippers may be payable to either the truck owner or to AMHM. If the check is made payable to AMHM, it will in turn issue its check to the driver or owner for the full amount.

It is the owner who extends credit to the shipper. The truck owners consider themselves as self-employed. Depending on how well they manage their affairs the truck owners operate at a profit or loss. They are profit motivated. The truck owners and drivers fill out Form 1099 for federal income tax purposes and Schedule C in reporting their income for the year.

Laws applicable to this appeal are A.R.S. § 23–615:

"'Employment' means any service of whatever nature performed by an employee for the person employing him, . . ."

§ 23–622:

"'Wages' means all remuneration for services for whatever source, including commissions and bonuses and the cash value of all remuneration in any medium other than cash. The reasonable cash value of remuneration in any medium other than cash shall be estimated and determined in accordance with regulations prescribed by the department."

§ 23–614:

"'Employing unit' means an individual or type of organization, including a partnership, association, trust, estate, joint-stock company, insurance company or corporation, whether domestic or foreign, or the receiver, trustee in bankruptcy, trustee or successor of any of the foregoing, or the legal representative of a deceased person, which has or subsequent to January 1, 1936, had one or more individuals performing services for it within this state. Effective January 1, 1962, 'employing unit' shall include any federal instrumentality, which is neither wholly nor partially owned by the United States, which has one or more individuals performing services for it within this state."

§ 23–613.01:

"A. 'Employee' means any individual who performs services for an employing unit and who is subject to the direction, rule or control of the employing unit as to both the method of performing or executing the services and the result to be effected or accomplished. Absent other evidence indicating the employing unit exercises direction, rule or control over the individual as to both the method of performing or executing the services and the result to be effected or accomplished, the following shall not be considered an employee under this section:

1. An individual who performs services for an employing unit which are not a part or process of the organization, trade or business of the employing unit and who is not treated by the employing unit in a manner generally characteristic of the treatment of employees.

2. An individual deemed subordinate or subject to the direction, rule or control, or the right thereof, of an employing unit solely because of a provision of law regulating the organization, trade or business of the employing unit.

3. An individual who performs services for an employing unit through isolated or occasional transactions, regardless of whether such services are a part or process of the organization, trade or business or the employing unit or who performs casual services for an employing unit.

4. An individual who performs services for an employing unit in a capacity as an independent contractor, business person, agent or consultant, or in a capacity characteristic of an independent profession, trade, skill or occupation.

B. Notwithstanding this section, an individual or class of individuals determined to be an employee or employees for purposes of the Federal Unemployment Tax Act, as amended, 26 U.S.C. § 3301 et seq. are employees under this chapter.

C. Notwithstanding any other provision of this chapter, this section shall apply to an employing unit to which the provisions of § 23–750 apply only to the extent not inconsistent with the requirements of 26 U.S.C. §§ 3304(A)(6) and 3309. Added Laws 1979, Ch. 179, § 1; Laws 1979, Ch. 215, § 1."

It is noted that this last section is expressly made applicable to all liability determinations made pursuant to Title 23, Chapter 4, A.R.S., which are the subject of any pending appeal before any court; thus, it applies to the instant case. Upon our review of applicable law, we find that A.R.S. § 23–613.01 represents a substantial departure from prior law. Under prior law, the Arizona Supreme Court has held that the statutory scheme under the Employment Security Act abrogated the common law definition of employee and independent contractor in favor of a more liberal construction so that the purposes of the act would be fully realized. *Beaman v. Superior Products, Inc.*, 89 Ariz. 119, 358 P.2d 997 (1961); *McClain v. Church*, 72 Ariz. 354, 236 P.2d 44 (1951). A.R.S. § 23–613.01 defines employee in much the same manner as the Federal Unemployment Tax Act. The Federal Unemployment Tax Act has adopted the common law test applied realistically. *Illinois Tri-Seal Products, Inc. v. United States*, 353 F.2d 216, 173 Ct.Cl. 499 (1965). A comparison of the IRS regulation pertaining to § 26 U.S.C. 3306(i), 26 CFR 31–3306(i)–1 with A.C.C.R. § R6–3–1723[1] reveals much similarity.

1. "A. 'Employee' means any individual who performs services for an employing unit, and who is subject to the direction, rule or control of the employing unit as to both the method of performing or executing the services and the result to be effected or accomplished. Whether an individual is an employee under this definition shall be determined by the preponderance of the evidence.

1. 'Control' or 'exercises . . . control' as used in A.R.S. § 23–613.01, includes the right to control as well as control in fact.

2. 'Method' is defined as the way, procedure or process for doing something; the means used in attaining a result as distinguished from the result itself.

\* \* \* \* \* \*

C. In determining whether an individual who performs services is an employee under the general definition of Subsection A, all material evidence pertaining to the relationship between the individual and the employing unit must be examined. Control as to the result is usually present in any type of contractual relationship, but it is the additional presence of control as determined by such control factors as are identified in Paragraph 2 of this Subsection, over the method in which the services are performed, that may create an employment relationship.

1. The existence of control solely on the basis of the existence of the right to control may be established by such action as: reviewing written contracts between the individual and the employing unit; interviewing the individual or employing unit; obtaining statements of third parties; or examining regulatory statutes governing the organization, trade or business. In any event, the substance, and not merely the form, of the relationship must be analyzed.

2. The following are some common indicia of control over the method of performing or executing the services:

a. Authority over individual's assistants. Hiring, supervising, and payment of the individual's assistants by the employing unit generally shows control over the individuals on the job. Sometimes, one worker may hire, supervise, and pay other workers. He may do so as the result of a contract in which he agrees to provide materials and labor and under which he is responsible only for the attainment of a result; in which case he may be independent. On the other hand, if he does so at the direction of the employing unit, he may be acting as an employee in the capacity of a foreman for or representative of the employer.

b. Compliance with instructions. Control is present when the individual is required to comply with instructions about when, where and how he is to work. Some employees may work without receiving instructions because they are highly proficient in their line of work and can be trusted to work to the best of their abilities; however, the control factor is present if the employer has the right to instruct or direct. The instructions may be oral or may be in the form of manuals or written procedures which show how the desired result is to be accomplished.

c. Oral or written reports. If regular oral or written reports bearing upon the method in which the services are performed must be submitted to the employing unit, it indicates control in that the worker is required to account for his actions. Periodic progress reports relating to the accomplishment of a specific result may not be indicative of control if, for example, the reports are used to establish entitlement to partial payment based upon percentage of completion. Completion of forms customarily used in the particular type of business activity, regardless of the relationship between the individual and the employing unit, may not constitute written reports for purposes of this factor; e. g., receipts to customers, invoices, etc.

d. Place of work. Doing the work on the employing unit's premises is not control in itself; however, it does imply that the employer has control, especially when the work is of such a nature that it could be done elsewhere. A person working in the employer's place of business is physically within the employer's direction and supervision. The fact that work is done off the premises does indicate some freedom from control; however, it does not by itself mean that the worker is not an employee. In some occupations, the services are necessarily performed away from the premises of the employing unit. This is true, for example, of employees in the construction trades, or employees who must work over a fixed route, within a fixed territory, or at any outlying work station.

e. Personal performance. If the services must be rendered personally it indicates that the employing unit is interested in the method as well as the result. The employing unit is interested not only in getting a desired result, but, also, in who does the job. Personal performance might not be indicative of control if the work is highly specialized and the worker is hired on the basis of his professional reputation, as in the case of a consultant known in academic and professional circles to be an authority in the field. Lack of control may be indicated when an individual has the right to hire a substitute without the employing unit's knowledge or consent.

f. Establishment of work sequence. If a person must perform services in the order or sequence set for him by the employing unit, it indicates the worker is subject to control as he is not free to follow his own pattern of work, but must follow the established routines and schedules of the employing unit. Often, because of the nature of an occupation, the employing unit does not set the order of the services, or sets them infrequently. It is sufficient to show control, however, if the employing unit retains the right to do so.

g. Right to discharge. The right to discharge, as distinguished from the right to terminate a contract, is a very important factor indicating that the person possessing the right has control. The employing unit exercises control through the ever present threat of dismissal, which causes the worker to obey an instructions which may be given. The right of control is very strongly indicated if the worker may be terminated with little or no notice, without cause, or for failure to use specified methods, and if the worker does not make his services available to the public on a continuing bases. An independent worker, on the other hand, generally cannot be terminated as long as he produces an end result which measures up to his contract specifications. Many contracts provide for termination upon notice or for specified acts of nonperformance or default, and may not be indicative of the existence of the right to control. Sometimes, an employing unit's right to discharge is restricted because of a contract with a labor union or with other entities. Such a restriction does not detract from the existence of an employment relationship.

h. Set hours of work. The establishment of set hours of work by the employing unit is a factor indicative of control. This condition bars the worker from being master of his own time, which is a right of the independent worker. Where fixed hours are not practical because of the nature of the occupation, a requirement that the worker work at certain times is an element of control.

i. Training. Training of an individual by an experienced employee working with him, by required attendance at meetings, and by other methods, is a factor of control because it is an indication that the employer wants the services performed in a particular method or manner. This is especially true if the training is given periodically or at frequent intervals. An independent worker ordinarily uses his own methods and receives no training from the purchaser of his services.

j. Amount of time. If the worker must devote his full time to the activity of the employing unit, the employing unit has control over the amount of time the worker spends working and, impliedly, restricts him from doing other gainful work. An independent worker, on the other hand, is free to work when and for whom he chooses. Full time does not necessarily mean an 8-hour day or a 5-or 6-day week. Its meaning may vary with the intent of the parties, the nature of the occupation and customs in the locality. These conditions should be

considered in defining 'full time.' Full-time services may be required even though not specified in writing or orally. For example, a person may be required to produce a minimum volume of business which compels him to devote all of his working time to that business, or he may not be permitted to work for anyone else, and to earn a living he necessarily must work full time.

k. *Tools and materials.* The furnishing of tools, materials, etc. by the employing unit is indicative of control over the worker. When the worker furnishes the tools, materials, etc., it indicates a lack of control, but lack of control is not indicated if the individual provides tools or supplies customarily furnished by workers in the trade.

l. Expense reimbursement. Payment by the employing unit of the worker's approved business and/or traveling expenses is a factor indicating control over the worker. Conversely, a lack of control is indicated when the worker is paid on a job basis and has to take care of all incidental expenses. Consideration must be given to the fact some independent professionals and consultants require payment of all expenses in addition to their fees.

D. Among the factors to be considered in addition to factors of control, such as those identified in Subsection C when determining if an individual performing services may be independent when Paragraph 4 of Subsection B is applicable, are:

1. Availability to public. The fact that an individual makes his services available to the general public on a continuing basis is usually indicative of independent status. An individual may offer his services to the public in a number of ways. For example, he may have his own office and assistance, he may display a sign in front of his home or office, he may hold a business license, he may be listed in a business directory or maintain a business listing in a telephone directory, he may advertise in a newspaper, trade journal, magazine, or he may simply make himself available through word of mouth, where it is customary in the trade or business.

2. Compensation on job basis. An employee is usually, but not always, paid by the hour, week or month; whereas, payment on a job basis is customary where the worker is independent. Payment by the job may include a predetermined lump sum which is computed by the number of hours required to do the job at a fixed rate per hour. Payment on a job basis may involve periodic partial payments based upon a percent of the total job price or the amount of the total job completed. The guarantee of a minimum salary or the granting of a drawing account at stated intervals, with no requirement for repayment of the excess over earnings, tends to indicate the existence of an employer-employee relationship.

3. Realization of profit or loss. An individual who is in a position to realize a profit or suffer a loss as a result of his services is generally independent, while the individual who is an employee is not in such a position. Opportunity for profit or loss may be established by one or more of a variety of circumstances; e. g.:

a. The individual has continuing and recurring significant liabilities or obligations in connection with the performance of the work involved, and success or failure depends, to an appreciable degree, on the relationship of receipts to expenditures.

b. The individual agrees to perform specific jobs for prices agreed upon in advance, and pays expenses incurred in connection with the work, such as wages, rents or other significant operating expenses.

4. Obligation. An employee usually has the right to end his relationship with his employer at any time he wishes without incurring liability, although he may be required to provide notice of his termination for some period in advance of the termination. An independent worker usually agrees to complete a specific job. He is responsible for its satisfactory completion and would be legally obligated to make good for failure to complete the job, if legal relief were sought.

5. Significant investment. A significant investment by a person in facilities used by him in performing services for another tends to show an independent status. On the other hand, the furnishing of all necessary facilities by the employing unit tends to indicate the absence of an independent status on the part of the worker. Facilities include equipment or premises necessary for the work, but not tools, instruments, clothing, etc., that are provided by employees as a common practice in their particular trade. If the worker makes a significant investment in facilities, such as a vehicle not reasonably suited to personal use, this is indicative of an independent relationship. A significant expenditure of time or money for an individual's education is not necessarily indicative of an independent relationship.

6. Simultaneous contracts. If an individual works for a number of persons or firms at the same time, it indicates an independent status because, in such cases, the worker is usually free from control by any of the firms. It is possible, however, that a person may work for a number of people or firms and still be an employee of one or all of them. The decisions reached on other pertinent factors should be considered when evaluating this factor.

E. Whether the preponderance of the evidence is being weighed to determine if the individual performing services for an employing unit is an employee under the general definition of employee contained in Subsection A, or may be independent when Paragraph 4 of Subsection B is applicable, the factors considered shall be weighed in accordance with their appropriate value to a correct determination of the relationship under the facts of the particular case. The weight to be given to a

We can only conclude from this analysis that the legislature by enacting § 23–613.01 intended that the type of employment relationship justifying the imposition of the unemployment tax should be more narrowly defined than before. Upon our examination of the facts of the instant case, we find that the drivers and their helpers are not employees.

## DRIVERS/TRUCKERS

■ AMHM contends that the truckers are individuals who perform services for them in the capacity of independent contractors and thus, AMHM is not required to pay unemployment taxes for their services. We agree.

A.R.S. § 23–613.01 recognizes that independent contractors are not employees for purposes of the Employment Security Act. The factor which distinguishes an independent contractor from an employee is that only the latter is subject to the control of the employing unit as to the method of performing the work. A.C.C.R. R6–3–1723(C) delineates the common indicia of control by the employing unit over the method in which the services are performed. The pertinent criteria are:

(a) Authority over the individual's assistants: The hiring, supervising, and payment of the individual's assistants by the employing unit generally shows control over the individual on the job. In the present case, it is the truckers who hire the helpers. They also supervise the helpers and pay the helpers for their services. AMHM only exercises control over the helpers when they perform the services of drivers. In this instance, AMHM requires information in order to comply with regulatory requirements.

(b) Compliance with instructions: Control is present when the individual is required to comply with instructions about when, where and how he is to work. Here, the truckers are not required to work set hours and can determine their own routes.

(c) Oral or written reports: If regular oral or written reports bearing upon the method in which the services are performed must be submitted to the employing unit it indicates control in that the worker is required to account for his actions. Control is required in this area by regulatory requirements.

(d) Personal performance: If the services must be rendered personally it indicates that the employing unit is interested in the method as well as the result. Here, the truck owners are free to hire their own drivers. They do not have to personally perform this service. Therefore, this aspect of control is not present in the instant case.

(e) Establishment of work sequence: If a person must perform services in the order or sequence set for him by the employing unit it indicates that the worker is subject to control in that he is not free to follow his own pattern of work. This criterion is not present in the instant case. The trucker has the right to refuse any trucking jobs.

(f) Right to discharge: The right to discharge as distinguished from the right to terminate a contract is a very important factor indicating that the person possessing the right has control. The employing unit exercises control through the ever present threat of dismissal which causes the worker to obey any instructions which may be given. The right to control is very strongly indicated if the worker may be terminated with little or no notice, without cause, or for failure to use specified methods. In the present case, the truckers can only be terminated without notice if they fail to give AMHM the agreed upon percentage of its

---

factor is not always constant. The degree of importance may vary, depending upon the occupation or work situation being considered and why the factor is present in the particular situation. Some factors may not apply to particular occupations or situations, while there may be other factors not specifically identified herein that should be considered.

F. An individual is an employee if he performs services which are subject to the Federal Unemployment Tax Act or performs services which are required by Federal law to be covered by State law.

freight charges or for repeated violations of safety regulations. This right to terminate is for specified acts of non-performance through default and is therefore not indicative of the existence of a right to control.

(g) Set hours of work: The establishment of set hours of work by the employing unit is a factor indicative of control. In this case there is no establishment of set hours of work.

(h) Training: Training of an individual by the experienced employee working with him is an indication of control. This element of control is missing here.

(i) Amount of time: If a worker must devote his full time to the activity of the employing unit, the employing unit has control over the amount of time the worker spends working and impliedly restricts them from doing other gainful work. An independent worker, on the other hand, is free to work when and for whom he chooses. In the present case, the truckers are not required to spend any specified amount of time working.

(j) Tools and materials: The furnishing of tools, materials, etc., by the employing unit is indicative of control of the worker. In the present case, the truckers provide their own tools.

(k) Expense reimbursements: Payments by the employing unit of a worker for approved business, and/or traveling expenses is a factor indicating control over the worker. In this situation, however, the trucker pays for his own expenses.

(l) Availability to public: In this case, the trucker's availability to the public is severely restricted by the Arizona Corporation Commission's regulations. However, the record shows that truckers do make themselves available to the public through word-of-mouth.

(m) Compensation on job basis: An employee is usually paid by the hour, week, or month, whereas an independent contractor is paid on the job basis. Here, the truckers are paid on the job basis. Furthermore, they are paid by the shipper rather than by AMHM.

(n) Realization of profit or loss: An individual who is in a position to realize a profit or suffer a loss as the result of his services is an independent contractor. In this situation the truckers are profit-motivated and they are in a position to suffer a profit or loss.

(o) Significant investment: A significant investment by a person and facilities used by him in performing services for another tends to show an independent status. Here, it is the truckers who own their own trucks and also own their own tools.

A.C.C.R. R6–3–1723 provides that these factors must be weighed to determine whether a person is an independent contractor or an employee. Weighing these factors in the instant case it is readily apparent that the truckers are independent contractors.

The conclusion that the truck drivers are independent contractors is supported by the decision of the United States Supreme Court in *Harrison v. Greyvan Lines, Inc.*, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed.2d 1757 (1947). In *Greyvan Lines* the trucking company contested its tax liability under the Social Security Act. The facts in *Greyvan Lines* were quite similar to the facts in the present case. *Greyvan Lines* was a trucking business for the carrying of household goods in interstate commerce. It entered into contracts with truck owners for the hauling of these household goods. During the term of the contract these truckers did not haul goods for any other company. The truckers were required to furnish their trucks and equipment and all labor necessary to pick up, handle and deliver the household goods. Further, the truck owners were required to pay all their own expenses, furnish their own insurance, except cargo insurance, and to pay for all loss or damage to the shipment. The company informed the truckers when and where to load but did not tell them what routes to use. The truck owner was generally the driver of the truck, with a substitute driver being allowed upon company approval. It was the truck driver's responsibility to collect the monies due to the company for the shipment and to deliver the monies to the

**30**

company office. The trucks were required to carry Greyvan identification. As compensation for their services the truck owners received a percentage of the tariff charged. Under these facts the Supreme Court concluded that the driver-owner had so much responsibility for investment in management that they were independent businessmen, stating:

" . . . where the arrangements leave the driver-owners so much responsibility for investment and arrangement as here, they must be held to be independent contractors. These driver-owners are small businessmen. They own their own trucks. They hire their own helpers . . . . It is the total situation, including the risk undertaken, the control exercised, the opportunity for profit from sound management, that marks these driver-owners as independent contractors." 331 U.S. 704, at 719, 67 S.Ct. 1463 at 1471.

The only factual distinction that can be drawn between *Greyvan* and the present case is that Greyvan exercised more control over the truck owners in that they provided these owners with instructions in the company's mode of operations and they provided all the necessary permits and certificates.

We note that prior to the adoption of A.R.S. § 23–613.01 the Arizona courts recognized that independent contractors were not covered under the Arizona Employment Security Act. *Arizona Dept. of Economic Security v. King*, 122 Ariz. 158, 593 P.2d 908 (1979). The *King* court held that there was no employer-employee relationship between the court reporters and their court reporting firm in that the court reporters were independent contractors. The court's determination was based upon its conclusion that the firm only performed those functions of a booking agency and office manager for the reporters. Similarly in the instant case, apart from the regulatory control which AMHM must exercise, it performs only managerial services and booking functions for the truckers.

## HELPERS

While the Supreme Court in *Greyvan Lines* did not deal with the issue of whether the truckers' helpers were employees by the trucking firm, the Circuit Court in *Greyvan Lines v. Harrison*, 156 F.2d 412 (1946), did deal with this issue. In finding that the truckmen's helpers were not employees of the trucking firm the court relied on the fact that except for the actual driving of the trucks, the contract imposed no restrictions whatsoever on the employment of helpers in that no report was required or expected as to those helpers, their identity, or the work performed by them for the company.

In the instant case, AMHM exercises aspects of control only on two occasions. It exercises control over the helpers when, as in *Greyvan*, they are to drive the truck. This aspect of control exercised is required by regulation. Second, AMHM asks for the identify of helpers who perform a set-up or take-down under its license. We conclude that this is insufficient to establish that AMHM exercised control over the helpers in the manner in which they performed their work. Therefore, there is no employer-employee relationship between AMHM and the helpers. Thus, AMHM is not required to pay employment taxes on helpers' wages.

Judgment reversed.

FROEB, P. J., and WREN, J., concur.