645 P.2d 1274

M. Z. MOORE, dba M. Z. Moore & Associates, Plaintiff-Appellant,

v.

ARIZONA DEPARTMENT OF ECONOMIC SECURITY, Defendant-Appellee.

No. 1 CA–UB 232.

Court of Appeals of Arizona, Division 1, Department C.

May 18, 1982.

M. Z. Moore, M. Z. Moore & Associates, in pro. per.

Robert K. Corbin, Atty. Gen. by J. David Rich, Asst. Atty. Gen., Phoenix, for defendant-appellee.

## OPINION

FROEB, Judge.

The issue raised in this review of a decision of the Unemployment Insurance Appeals Board is whether services performed for M. Z. Moore, dba M. Z. Moore & Associates, by salespeople, runners and traffic directors constitute employment as defined in A.R.S. § 23–615 which are not excluded from coverage under the provisions of A.R.S. § 23–613.01. We find the services are not covered employment and therefore reverse the decision of the Appeals Board. Another opinion on the same subject is also filed this date in *Dial-A-Messenger, Inc. v. Arizona Department of Economic Security*, 1 CA–UB 153 (May ___, 1982).

## THE FACTUAL BACKGROUND

M. Z. Moore, dba M. Z. Moore & Associates (Moore), is engaged in the business of selling commercial time allotments for radio programming. Moore contracts with radio station KXIV to sell six minutes per hour during the six-hour period between 10:00 A.M. to 4:00 P.M., Mondays through Saturdays. Moore also contracts with radio station KRDS which allots him four thirty-second commercials in each five-minute newscast broadcasted hourly between 12:00 Noon and 6:00 P.M., inclusive, Mondays through Saturdays.

The written contract between Moore and radio station KXIV provides that the initial contract is for one year, and thereafter the agreement may be terminated by either party on ninety days' notice; that advertising sold by Moore will be prepaid; that advertisers or accounts sold by Moore will receive thirty-second announcements at $198, or multiples thereof, or $99 minimum announcements during the foregoing periods alloted to Moore; that Moore is to make weekly reports to the radio station, at which time the station is to be paid by Moore for all monies due up to that time; that Moore will provide copy, service and scheduling; that the station reserves the right to refuse or preempt any advertiser and to schedule makeups for preempted advertisers; and that the advertisers' checks are payable to the station, to be endorsed by and deposited to Moore's personal account.

Moore performs his services for the radio stations via salespeople who solicit businesses in the Phoenix area. A new salesperson applicant is interviewed by Moore or by the traffic director. There is no application form. Until the latter part of 1980, a new salesperson unilaterally would sign a written statement providing that it is understood his association with Moore is that of an independent contractor, and all tax matters would be handled by him as a self-employed individual. Subsequently, the statement signed by the new salesperson was revised by Moore adding that the salesperson understands that the office will be open and accessible to him from 9:00 A.M. to 5:00 P.M., Mondays through Fridays; that a desk and telephone will be available for his use during these hours; that he can set his own hours and can sell and come and go as he wishes; that he agrees to sell only the times allotted to Moore by the radio stations at the prices agreed upon between Moore and the station; that he will make a commission statement to Moore every Monday and receive his twenty-five percent of all sales at that time; that he will pay expenses such as travel, subscriptions and long-distance calls; that it is his desire to work in the best way to make the most

money; that his productivity will be reviewed after three weeks by Moore and himself; and that it will be his option to continue or quit.

The operation is explained to a new salesperson at the time of his engagement. The salesperson is provided with a sample sales presentation, office space, a desk and a telephone. He is provided with a brochure and rate cards furnished by the station. Local telephone calls are made at Moore's expense. A salesperson can use a presentation other than the one suggested as long as he sells the allotted radio time to advertisers. A capable, experienced salesperson can learn the techniques of selling broadcast time in about one day. Each salesperson takes a page from the telephone book and calls the businesses listed therein. Moore keeps a board on which entries are written every time a sale is made in order for the salespeople to know what time slots remain available.

The price is established by the radio station as stated in its contract with Moore. All sales must be on a cash basis and paid in advance. No credit can be extended and an announcement cannot be put on the air without first paying the radio station. The salesperson or the traffic director makes the arrangement with the advertiser for the runner or collector to bring the contract to the advertiser and to obtain his check in full payment. The advertising contract and the copy read over the air are generally prepared by the traffic director. They may also be prepared by the salesperson. The contract forms bear the name of the radio station. They are sometimes printed and furnished by Moore. The advertiser's contract sold by the salesperson is an agreement between the radio station and the advertiser. Copies of all contracts are kept alphabetically in Moore's office.

The evidence indicates it would be impractical for the salespeople to make telephone solicitations from their homes. The nature of the service requires that the solicitation be performed during the customary business hours of 9:00–10:00 A.M. to 5:00 P.M. The service of all salespeople is a cooperative operation which necessitates that calls be made from Moore's office so that the same potential client is not contacted by different salespeople and so that everyone can be kept current as to the time slots available.

Salespeople receive no fringe benefits from Moore. They get no liability or health insurance, vacation or sick pay. There is no requirement for working a minimum number of days or hours. Economics dictate that they do not continue if they do not make money. There is a fast turnover of salespeople. The traffic director, the runner and some salespeople have keys to Moore's office. Sales meetings are not held. Salespeople do not operate under trade names and have no business offices of their own. They are not given a Form W–2, or a Form 1099. Moore has not asked salespeople whether they filed a Schedule C for income tax purposes.

The advertiser makes his check payable to the radio station. The station turns the check over to Moore, who endorses it and deposits it to his personal account. Moore then pays the radio station fifty percent, the salesperson twenty-five percent, the traffic director five percent, and retains twenty percent. The salespeople turn in a statement sheet on Mondays showing the commission due them and on the same day they are paid twenty-five percent of the collected sales. If a salesperson writes one thousand dollars' worth of business in a week, he is paid a bonus of twenty-five dollars.

There are no restrictions on salespeople as to other employment or activities, but the evidence indicates they have never solicited advertising for other stations at the same time they solicited for KXIV or KRDS. Several of them work at other jobs in addition to their telephone solicitation, including selling coal, waitering, and working as a doorman.

Occasional long-distance telephone calls are made and paid for by the salespeople,

consisting of occasional calls to Tucson or to other cities. Salespeople have no need for a typewriter. When a contract must be mailed to an out-of-town account, the salesperson pays the postage. Renewals belong to the salesperson who sold the original contract. Usually, when a salesperson terminates the relationship, he turns over the right to a renewal to another salesperson. Where this is not done, the renewal is taken over by the traffic director.

In addition to the salesperson engaged in telephone solicitations, individuals referred to as runners or collectors also perform services for Moore. The unilateral statement signed by the runner states that it is understood that his association with Moore is that of an independent contractor; that all tax matters will be handled by him as a self-employed individual; that he is to deliver contracts and pick up copy material and checks from accounts sold by Moore; that he will furnish his own car and expenses and will be paid an agreed pickup fee; that the first pickup fee each week will be the largest commissioned one and the rest will be for a smaller fee as agreed, and that he can work out of the office, his home or anywhere else; and that he may engage in sales of products or real estate or hire someone if he wishes.

The runner or collector is currently paid $75 for the first pickup each week and in addition is paid out of the salesperson's commission for each additional pickup. The larger first pickup fee is paid by the station and by Moore. The runner works his own hours, usually between 9:00 A.M. and 5:00 P.M. When the salesperson obtains the initial agreement after telephone solicitation, he or the traffic director prepares the customer contract and sends the runner to get the check, the signed contract, and the copy material. The runner returns it all to the office. Moore deposits the check and the salesperson is then entitled to his commission.

The traffic director performing services at the time of these proceedings started as a salesperson with Moore about nine years earlier. He was appointed traffic director when the previous traffic director suddenly left. His services as traffic director are in addition to his services as a salesperson. In addition to his regular commission as a salesperson, he is paid five percent of receipts for his duties as traffic director, which consist of writing commercials, coordinating the services of salespeople and runners among themselves and Moore, and handling telephone calls. He provides his own typewriter, which he uses to type his commercials, and buys his own stamps. He uses his car for personal use and for seeing clients from time to time. He files a Schedule C for income tax purposes. While in the office, he spends most of his time soliciting his own sales by telephone, as do the other salespeople. He types the copy at home because he does not have the time to do it in the office. He answers incoming telephone calls, which he either turns over to other salespeople or handles himself. He has interviewed new applicants. He also keeps the board in the office current as to the time slots available for sale. He usually comes to work at the office between 9:00 and 9:30 A.M. and works until about 4:30 P.M. He or the runner opens the office in the morning and he usually closes the office.

## THE APPLICABLE LAW

The term "employee" was defined in A.R.S. § 23–613.01, which provided, at times relevant herein, as follows:

A. "Employee" means any individual who performs services for an employing unit and who is subject to the direction, rule or control of the employing unit as to both the method of performing or executing the services and the result to be effected or accomplished. Absent other evidence indicating the employing unit exercises direction, rule or control over the individual as to both the method of performing or executing the services and the result to be effected or accomplished,

the following shall not be considered an employee under this section:

1. An individual who performs services for an employing unit which are not a part or process of the organization, trade or business of the employing unit and who is not treated by the employing unit in a manner generally characteristic of the treatment of employees.

2. An individual deemed subordinate or subject to the direction, rule or control, or the right thereof, of an employing unit solely because of a provision of law regulating the organization, trade or business of the employing unit.

3. An individual who performs services for an employing unit through isolated or occasional transactions, regardless of whether such services are a part or process of the organization, trade or business of the employing unit or who performs casual services for an employing unit.

4. An individual who performs services for an employing unit in a capacity as an independent contractor, business person, agent or consultant, or in a capacity characteristic of an independent profession, trade, skill or occupation.[1]

Department regulation A.C.R.R. R6–3–1723, implementing A.R.S. § 23–613.01, provides, in pertinent part:

1. "Control" or "exercise . . . control" as used in A.R.S. § 23–613.01, includes the right to control as well as control in fact.

2. "Method" is defined as the way, procedure or process for doing something; the means used in attaining a result as distinguished from the result itself.

The Department contends that the salespeople soliciting radio advertising by telephone and the runner or collector are performing services for Moore as employees under the general definition of employee contained in A.R.S. § 23–613.01(A) and that

these individuals are not excluded under any of the exclusions of this section. Moore contends that the disputed individuals herein perform services in their capacity as independent contractors as contemplated under A.R.S. § 23–613.01(A)(4), and that such services do not constitute employment. The Board determined that the disputed individuals were employees and that Moore is therefore subject to unemployment taxes on their wages.

On appeal, this court does not sit as a trier of fact and will not substitute its view of the facts nor reverse the administrative decision if it is supported by any reasonable interpretation of the evidence. *Gardiner v. Arizona Department of Economic Security*, 127 Ariz. 603, 623 P.2d 33 (1980); *Richert v. Employment Security Commission*, 20 Ariz.App. 99, 510 P.2d 410 (1973). This court may, however, substitute its judgment for the Department's conclusions regarding the legal effects of such facts. *Gardiner, supra; Arizona Department of Economic Security v. Magma Copper Co.*, 125 Ariz. 23, 607 P.2d 6 (1980).

Control over the result to be accomplished by the individuals performing services for Moore is not helpful in resolving the issue here since such control would exist regardless of whether the persons involved are independent contractors. As we have previously stated, "[t]he factor which distinguishes an independent contractor from an employee is that only the latter is subject to the control of the employing unit as to the method of performing the work." *Smith v. Arizona Department of Economic Security*, 128 Ariz. 21, 28, 623 P.2d 810, 817 (App.1980). The Department has established indicia of control over the method by which services are performed which are set forth in A.C.R.R. R6–3–1723(C)[2], and they are not here challenged. The degree of

1. This section has since been amended by Laws 1981, Ch. 246, § 2.

2. The full text of A.C.R.R. R6–3–1723(C) setting forth factors adopted by the Department of

Economic Security is reproduced in *Smith v. Arizona Department of Economic Security*, 128 Ariz. at 25–27, 623 P.2d at 814–16.

control necessary to designate a person as an employee under A.R.S. § 23–613.01 must be determined with reference to the peculiar circumstances of the particular case. The factors must be weighed in the light of the particular occupation or work situation being considered. A.C.R.R. R6–3–1723(E). With this in mind, we apply the facts of this case to these indicia of control.

(A) *Authority over the individual's assistants*: Authority by the employing unit over the individual's assistants indicates control over the individual. None of the workers for Moore has ever had occasion to hire assistants. This element is therefore not applicable to the situation here.

(B) *Compliance with instructions*: Control is indicated when the individual is required to comply with instructions about when, where, and how to work. With respect to this factor, the Board found that the salespeople were required to perform their jobs at the office of the employing unit. The record, however, does not indicate that the salespeople were instructed by Moore to work at his office. Because of the nature of the business, most of the salespeople worked at the office in a cooperative operation. To avoid duplication of customer contacts, each salesperson takes a page from the telephone directory and contacts the businesses therein. The salesperson records his sales on a board kept in the office so that others will know what remaining time slots are available. Thus, as a practical matter, Moore's office is the most convenient and effective place for the salespeople to work. Nevertheless, the record indicates that some of the individuals did occasionally work from their homes. Some of the businesses would request that the solicitor call back at night, and the salesperson would then call back from his home. Allan Overlock, the traffic director, testified that he wrote the advertisements at home during the evenings.

The record shows that the salespeople establish their own work hours. Moore testified that he spends very little time in the office and didn't know or care what hours the salespeople worked so long as they made the sales. Overlock testified that only one or two of the salespeople work four to six hours a day five days a week. Some of the other salespeople come in at 9:30 or 10:00 A.M., and "take off when they want to." Overlock further testified that he took his vacation time "whenever I want to go," and that he takes "a day off here and there when I feel like it."

With regard to how the salespeople perform their services, the record indicates that they are initially provided with a sample sales talk. They are not required to use it, however, and they generally develop their own. Moore does not observe the salespeople to evaluate their presentations. There are no manuals or office policy procedures given to the salespeople. The services of the salespeople, the runner and the traffic director is a cooperative operation. The salespeople cover for each other when they are out of the office. Although the salespeople are instructed to take out a page from the telephone directory and contact the businesses therein, there is no indication that they are instructed as to which pages to use. The salespeople also bring leads that they have obtained through the newspapers. They coordinate the contacts among themselves to avoid duplication of effort.

The only restrictions as to the type of clients the salespeople may solicit are those imposed by the Federal Communications Commission. They are required by radio stations to make sales on a cash basis only. They sell the radio time slots at the prices established by the radio station. Moore testified that he would allow the salespeople to sell at a discount if they wanted to sacrifice their commission. This has not happened but a couple of times in the last five years. The salespeople cannot, however, increase their commission by selling the spots at a price higher than that established by the radio stations. Moore has never rejected a contract drawn by one of the salespeople

for the radio stations and the client. Thus, the only instructions with which the disputed individuals are required to comply are those imposed by the radio stations or by the Federal Government.

(C) *Oral or written reports* : Written reports to the employing unit regarding the method by which services are performed indicates control in that the worker must account for his actions. No such reports are required by Moore.

(D) *Place of work* : This is discussed previously in paragraph (B).

(E) *Personal performance* : Services which must be rendered personally indicate the employing unit is interested in the method as well as the result. The record indicates that Moore did not care whether the salespeople had somebody else do the work in their place. Overlock testified that the runner often had her sister make the pickups for her. One of the salespeople brought his cousin in to solicit without Moore's knowledge. He was later introduced to Moore and treated just like the other salespeople.

(F) *Establishment of work sequence* : A requirement that services be performed in the order or sequence set for him by the employing unit indicates that the worker is subject to control in that he is not free to follow his own pattern of work. All sales are handled in essentially the same way in an established routine which involves the coordinated services of the salespeople, the runner, the traffic director and Moore. This routine involves the selecting and contacting of potential customers, the selection of time slots available for sale, obtaining a signed contract, collection of the money, the preparation of the copy to be read over the air and the payment of earned commissions by the employing unit to the individuals. This routine is dictated by the nature of the phone soliciting business rather than by any direct mandate from Moore. The work sequence does not, therefore, indicate control by Moore.

(G) *Right to discharge* : The right to discharge as distinguished from the right to

terminate a contract is generally an important factor indicating that the person possessing the right has control. In the present case, however, the right to discharge is not an important factor. Economics dictate that the disputed individuals do not stay if they do not make money on a straight commission basis. Consequently, there is a large turnover of salespeople by reason of their voluntary terminations. Moore has not had an occasion to fire anyone.

An agreement which provides that the employing unit may terminate the worker without notice and without cause for failure to use specific methods, or for failure to make services available to the public on a continuing basis, would indicate the right of control. A.C.R.R. R6–3–1723(C)(2)(g). The unilateral agreement signed by the workers in this case is silent on this matter. Little weight therefore can be given to this factor in the present case.

(H) *Set hours of work* : The establishment of set hours of work by the employing unit is a factor indicative of control. While the nature of the telephone soliciting business requires the services to be performed predominantly during customary business hours, the workers are free to choose what hours they work and when they take their vacations. This is discussed in greater detail earlier in paragraph (B).

(I) *Training* : Training of an individual is indicative of control. This element of control is lacking here because Moore engages only experienced salespeople who can pick up the techniques of selling broadcast time in about one day.

(J) *Amount of time* : The devotion of a worker full time to the activity of the employing unit indicates control by the employing unit. The disputed individuals in this case are not required to spend any specific amount of time working for Moore. There are no restrictions as to other employment or activities. There is no evidence that the salespeople solicit for other broadcast representatives; however, this is

a limited field. In fact, Moore knew of no other similar business in the state. Some of the salespeople perform other jobs, such as selling coal, waitering, and working as a doorman at a restaurant.

(K) *Tools and materials* : The furnishing of tools, materials, etc., by the employing unit is indicative of control. In this case, Moore provides the office, desk, telephone, forms of contracts, commission reportings, and a sample sales presentation. The salespeople pay for their own long-distance telephone calls, stamps, pencils and paper. The runner furnishes his own automobile and pays all his automobile expenses, including gas. Because both Moore and the workers provide tools and materials, this factor is neutral with respect to the balancing task at hand.

(L) *Expense reimbursement* : Payment by the employing unit of the worker's business and/or traveling expenses indicates control over the worker. A lack of control is indicated when the worker is paid on a job basis and has to take care of all incidental expenses. Moore does not reimburse any of the disputed individuals for expenses. In fact, the salespeople must reimburse Moore for all long-distance telephone calls made on his phone. The workers are paid on a job percentage basis and cover some of their expenses. See (K) above. This element of control is absent in this case.

A.C.R.R. R6–3–1723(D) suggests certain factors which indicate an independent status:

(1) *Availability to the public* : The fact that an individual makes his services available to the general public on a continuing basis is usually indicative of independent status. This factor is absent here.

(2) *Compensation on job basis* : All disputed individuals here are paid on a percentage basis.

(3) *Realization of profit or loss* : Because the expenses incurred by the salespeople are relatively small, they are generally not in a position to suffer a loss. Such does not seem impossible, however, in light of the fact that one salesperson incurred one hundred dollars' worth of long-distance calls in one month. The runners and the traffic director are in more of a position to suffer a loss since their automobile expenses could be quite high. Their income, then, depends upon the relationship of their expenses to their earned commissions. They are therefore in a position to realize profit or suffer loss, which indicates an independent status.

(4) *Obligation* : An employee usually has the right to end his relationship with his employer at any time he wishes without incurring liability. An independent contractor, on the other hand, usually agrees to complete a specific job and would be legally obligated to make good for failure to complete the job if legal relief were sought. The only agreement which deals with this matter is between Moore and Overlock, the traffic director. The agreement signed by Overlock states: "It is my desire to work in the best way to make the most money. After three weeks time my productivity will be reviewed by M. Z. Moore and Associates and me, and it will be my option to continue or quit." The record indicates that salespeople have quit in the past, some without any notice, without incurring liability. It appears this factor of independent status is absent.

(5) *Significant investment* : A significant investment by a person in facilities used by him in performing services for another tends to show an independent status. On the other hand, the furnishing of all necessary facilities by the employing unit tends to indicate an employer-employee relationship. Although the workers do not make a significant investment, neither does Moore provide all necessary facilities; therefore, the facts in this case do not fall within either of these categories, but rather, somewhere in between. The salespeople do not make a significant investment as they pay only for pens, paper, stamps, and infrequent long-distance telephone calls. The traffic

director also furnishes his own typewriter and car, when needed. The runner incurs the greatest investment since she makes all pickups and deliveries in her own car and pays all expenses incidental thereto. This factor of independent status, then, is strongest with respect to the runner and weakest with respect to the salespeople.

(6) *Simultaneous contracts*: Working for a number of persons or firms at the same time indicates independent status because in such cases the worker is usually, although not always, free from control by any of the firms. Here, some of the individuals worked as waiters, doormen, or coal salesmen at the same time they were soliciting for Moore.

The only factor of control which indicates that the disputed individuals in this case are employees of Moore is their apparent ability to terminate their relationship with Moore at any time. All of the other factors either indicate independent status or do not add weight to either side in the balancing process. We hold the factors indicating an employee status are not sufficient in this case to support the Board's decision finding these individuals to be employees. The evidence is insufficient to establish that Moore exercised control over the manner in which these individuals performed their work. Moore is not required, therefore, to pay unemployment taxes on their earnings.

For the reasons set forth, the decision of the Unemployment Insurance Appeals Board is reversed.

EUBANK, P. J., and HAIRE, J., concur.